**UNITED STATES of America,**
**Appellee,**

v.

**Jackson D. LEONARD, Appellant.**

**No. 1176, Docket 75–1153.**

United States Court of Appeals,
Second Circuit.

Argued July 18, 1975.

Decided Aug. 28, 1975.

As Amended on Denial of Rehearing
Nov. 18, 1975.

1078

James Schreiber, New York City (Walter, Conston, Schurtman & Gumpel, P. C., and Alan Kanzer, New York City, of counsel), for appellant.

W. Cullen MacDonald, Asst. U. S. Atty., New York City (Paul J. Curran, U. S. Atty., for the Southern District of New York, New York City, and John C. Sabetta, Asst. U. S. Atty., of counsel), for appellee.

Before MOORE, FRIENDLY and VAN GRAAFEILAND, Circuit Judges.

FRIENDLY, Circuit Judge:

Jackson D. Leonard, a successful New York chemical engineer, appeals from his conviction, after trial before Judge Owen and a jury in the District Court for the Southern District of New York, on two counts of an indictment charging him with violation of 26 U.S.C.

§ 7206(1).[1] The first count charged the omission of $24,168.09 from Leonard's reported 1967 adjusted gross income of $259,051.97; the second count charged the omission of $58,684.42 from reported 1968 adjusted gross income of $134,-276.00. He received a light sentence—concurrent terms of 18 months of imprisonment with 15 months suspended, fines of $5,000 on each count and the costs of prosecution.

## I.

Of the many claims of error, only a few relate to the basic question of guilt. We shall deal with these in this section of the opinion. In that connection it will be necessary to summarize the evidence, which in view of the verdict we must do in the light most favorable to the Government.

On February 20, 1967, Leonard, "doing business under the name and style of the Leonard Process Company," a sole proprietorship, and Union Carbide Corporation (UCC) entered into a contract for engineering services in connection with the construction of two chemical plants—a very large one in Taft, Louisiana, which was built, and a smaller one in South Charleston, West Virginia, which was not. Leonard's fees were to be of two sorts. One sort consisted of initial lump sum payments of $180,000 and later periodic payments of $37,000 each. The indictment did not charge that any such payments had been unreported. The other sort was a 10% override on UCC's reimbursements for amounts paid by Leonard to subcontractors performing detailed engineering services which his office was not equipped to provide. The Treadwell Corporation of New York became the subcontractor. None of these 10% over-

rides were reported as income for 1967 or 1968.

The general pattern which Leonard established was as follows: UCC would send him a single check covering the total amount owing for the subcontracted services including the 10% override, and in some cases also including the $37,000 periodic payment due to Leonard. Instead of depositing the UCC check in his bank account at First National City Bank (FNCB) and then paying Treadwell, Leonard endorsed the UCC check and sent it to Treadwell. Treadwell would then send Leonard one or two checks, as the case might be, one for the 10% override and another for the periodic payment due to Leonard when this had been included in the UCC check. While the return checks for the periodic payments found their way into bank accounts, as did other UCC checks not including Treadwell payments, Leonard never deposited the checks representing the 10% override—$24,168.09 in 1967 and $58,684.42 in 1968. Instead he cashed them or used them to purchase travelers' checks.

So far as concerns his 1967 return, Leonard's claim is that the Government did not bear its burden of proving that the $24,168.09 of undeposited checks had not in fact been reported. The proof was this: Leonard's 1967 FNCB bank statements bear markings identifying certain deposits as UCC deposits, and others as coming from other jobs he was doing. Marion Bardes, who worked as a freelance bookkeeper for Leonard accountants, testified that she had prepared a first draft of Leonard's 1967 tax return on the basis of these bank statements. The work papers for this draft return show that a figure of $291,000, as income from the UCC contract, was arrived at by adding the lump-sum pay-

1. This provides that:

Any person who—

(1) Declaration under penalties of perjury. —Willfully makes and subscribes any return, statement, or other document, which contains or is verified by a written declaration that it is made under the penalties of

perjury, and which he does not believe to be true and correct as to every material matter; or

. . . . .

shall be guilty of a felony. . . .

ments and the periodic payments which had been deposited in 1967. This $291,000 was added to other Leonard income to make a total figure of $461,000 as gross income from Leonard's engineering activities. The figure of $461,000 was carried through each of the several drafts of Leonard's return and appeared as the "gross receipts" figure on Schedule C of the return that Leonard filed. That Schedule C showed a net profit of $256,873.95 which, when combined with a loss of $15,166.48 from his wife's Schedule C, yielded a profit of $241,707.47 which was entered on their Form 1040, as "Business income." That last figure was combined with miscellaneous other income of $17,344.50 to give an adjusted gross income figure of $259,051.94; it is this figure which Leonard is charged with having understated.

The defendant raises three objections: First, he claims there is no testimony to show that it was Leonard who identified the various income items on his bank statements as a basis for the preparation of his tax return. Second, he claims there is no evidence that the missing $24,168.09 was not included as part of the other $170,000 of income (i. e., the difference between $291,000 and $461,000). Third, he stresses that Miss Bardes did not prepare the final return and contends that, since the government did not put the final preparer on the stand, the evidence is insufficient to connect the earlier draft forms with the return ultimately filed with the IRS.

█ All these were arguments for the jury, not for us. The jury was entitled to infer that Leonard had given the bank statements to the accountants for the purpose of preparing his return, knowing that the statements contained some but not all the UCC payments. The second point is frivolous; an exhibit shows the items that made up the other $170,000, and the Treadwell 10% pay-

ments were not among them. On the third point while the Government's case would have been stronger if it had called the person who prepared the final form and elicited that he had relied on the initial drafts, Miss Bardes' testimony showed that she had formulated the $461,000 figure that appeared on the final return, using bank records which Leonard knew did not contain the $24,168.09 of Treadwell checks he had cashed or used for buying travelers checks. In the absence of any contrary evidence, this was enough to permit the jury to infer that the $24,168.09 was not included on the final return, and that Leonard knew it was not included. If any further evidence of wilfulness were needed, it would be furnished by Leonard's clumsy attempt to delete the 10% override provision from the copy of the contract that was exhibited to Revenue Agent Laski in the course of the audit.

█ Leonard's argument about the 1968 return is quite different. Conceding that he directed that the 10% payments from Treadwell, and for that matter the $37,000 payments subsequent to January, not be included in his 1968 personal income tax return, he says they were not required to be. This result follows, he claims, because in January, 1968, he formed a corporation entitled The Leonard Process Co., Inc. (hereafter Leonard Inc.) to which he transferred the business of his sole proprietorship, The Leonard Process Company. On January 18, 1968, The Leonard Process Co., Inc. filed Form 2253, electing to have its income taxed directly to its shareholders as a small business corporation under Subchapter S of the Internal Revenue Code, for the taxable year beginning January 1, 1968. By letter of March 22, 1968, UCC agreed to an assignment of its contract from Leonard Process Company to Leonard Inc., effective February 1, 1968.[2] After February 1, 1968, Leon-

---

**2.** Apparently use of the February 1st date was due to a belated recognition that unless Leonard Inc. had a fiscal year starting later than January 1, 1968, the benefit of using Subchapter S as a means for shoving income into 1969 would not be realized.

ard deposited the $37,000 checks from UCC in a Leonard Inc. bank account. However, both before and after February 1st, he continued the practice of cashing the 10% checks from Treadwell —$6,229.20 for January and $52,455.22 for later months—although the checks after February 1 admittedly belonged to Leonard Inc. In response to the Government's contention that this simply meant that the checks were embezzled income reportable in the year of embezzlement, *James v. United States,* 366 U.S. 213, 81 S.Ct. 1052, 6 L.Ed.2d 246 (1961), Leonard argues that, under this court's decision in *DiZenzo v. C. I. R.,* 348 F.2d 122 (2 Cir. 1965), they are to be treated rather as constructive dividends. Acceptance of this still does Leonard no good unless, as he asserts, Leonard Inc. had no earnings or profits, IRC §§ 301(c), 316. He contends that it had none in the year beginning February 1, 1968, and that a properly instructed jury could find that the failure to include the $6,229.20 for January, 1968, was not material.

The Government introduced no evidence on the subject except to show that Leonard Inc. did not file a Subchapter S corporate tax return (Form 1120S) for 1968, 1969 or 1970. The defense offered two exhibits purporting to be copies of a proposed corporate income tax return for the period February 1, 1968, to January 31, 1969, see note 2, showing a loss of $73,742.33; both copies were subscribed by the accounting firm, and one was also signed "Jackson D. Leonard." The return was presented through a member of the accounting firm but without any testimony by any person who had prepared it; the judge admitted it only for the purpose of showing that such a return had been prepared but not as evidence of the truth of the matter asserted. The Government countered with another unfiled form showing a loss of only $29,-

017.77, for the year beginning February 1, 1968, which the judge admitted on the same limited basis. This latter form was of little weight since it was wholly unsigned and was marked "superceded" [3]

There is no doubt that if this had been a civil case, Leonard would have had the burden of showing "that the corporation did not have earnings and profits equal to the amounts diverted," *DiZenzo v. C. I. R., supra,* 348 F.2d at 126–27, and that he would not have met it. But he contends he had no such burden under the rules governing the burden of proof in criminal prosecutions.

In prosecutions for income tax violations, production of a rather slight amount of evidence by the Government, here the proof of receipt of what are charitably characterized as constructive dividends rather than embezzled funds, may transfer the burden of going forward to the defendant, see *Holland v. United States,* 348 U.S. 121, 137–39, 75 S.Ct. 127, 99 L.Ed. 150 (1954); *United States v. Vardine,* 305 F.2d 60, 63 (2 Cir. 1962). Although the ultimate burden of persuasion remains with the Government, Leonard did not introduce sufficient evidence of an absence of earnings or profits to warrant submission to the jury of a claim that, except for January 1968 income, the assignment of the UCC contract to Leonard Inc. constituted an absolute defense. The corporate tax return was never filed. Even if the copies of the proposed return were admissible at all as proof of the facts stated in the absence of testimony by the preparer, which seems doubtful, see *Standard Oil Co. of California v. Moore,* 251 F.2d 188, 222–23 (9 Cir. 1957), *cert. denied,* 356 U.S. 975, 78 S.Ct. 1139, 2 L.Ed.2d 1148 (1958), the mere existence of copies of an unfiled return carries little weight; indeed, the defense's failure to call the preparer could properly give rise to a

---

We give no weight to the Government's contentions that the assignment was invalid for want of consideration since Leonard remains personally liable, or that it was valid only from March 22, 1968. Whatever merit those contentions might have in litigation between the parties, and we doubt that they would have any, they are not open to the IRS. There is no claim that the assignment was a sham.

**3.** Neither draft return included the cashed Treadwell checks as income.

negative inference whether Leonard Inc. had a loss. See 8 Wigmore, Evidence § 2273 (McNaughton rev. 1961). The books and records were apparently "corrected" in several respects, including the moving of a $40,000 item from an income to a loan column; the "uncorrected" sheets would support the unsigned form showing a loss of only $29,017.77—not enough to counterbalance the $58,684.-12 of undeposited Treadwell checks. If these changes could be explained, defendant had the burden of going forward and doing so by calling the preparer or some other witness. Moreover, the books were not closed on December 31, 1968, and the proposed return was for the wrong year. Leonard Inc. had elected a tax year beginning January 1, 1968. The IRS Regulations are quite explicit that a Subchapter S corporation may change its tax year only with the prior approval of the Commissioner—Reg.1.442–1(c)(4)—which is by no means routinely given—see Reg. 1.442–1(b)(1), especially examples ii and iii(a). See also 7 Mertens, Federal Income Taxation § 41B.21 (1967). The only issue on which Leonard was entitled to have the jury consider the assignment, and the unfiled return, was that of wilfulness, and it was clearly permissible for the jury to find that this evidence did not negate the other evidence bearing on that point.

The only remaining point on this phase of the case is Leonard's contention concerning the charge. Trial counsel for Leonard had submitted a request to charge in regard to Leonard Inc., which sounded in terms of an absolute defense to Count Two rather than as bearing only upon wilfulness. Before instructing the jury, the judge informed counsel that he would not give the requested charge. The judge said nothing specific about the defendant's contention relating to Leonard Inc., relying rather on his general remarks about wilfulness and burden of proof. After the charge Leonard's counsel excepted generally to the failure to give requested charges; he also asked that since the judge had outlined some of the Government's conten-

tions, he should also outline the defendant's. The court agreed to do this and mentioned several defense contentions, not including the one about Leonard Inc. Counsel expressed no further objections.

The requested charge suffered from the usual defect of asking more than was deserved. For reasons already indicated, the judge was not required to, indeed could not correctly, charge that "[T]he proof in this case shows that in the first year of operation, the corporation sustained a loss of approximately $73,000." Neither was Leonard entitled to have the jury instructed "as a matter of law that the checks addressed to The Leonard Process Co., Inc., from the period February 1968 through November 1968 are returns of capital and are not taxable;" there was no evidence that this was so. Although lawyers seem never to learn the lesson, it is elementary that to put a trial court in error for declining to grant a requested charge, the proffered instructions must be accurate in every respect. *Southern Ry. Co. v. Jones*, 228 F.2d 203, 213 (6 Cir. 1955); *Shaw v. Lauritzen*, 428 F.2d 247, 250 (3 Cir. 1970). The most to which Leonard was entitled was a charge that if the jury found he believed both that the undeposited checks beginning in February 1968 were the property of Leonard Inc., and that Leonard Inc. had no earnings or profits, the jury could find a lack of wilfulness in failing to report these payments in his personal income tax return. We have no reason to think that if counsel had requested such a charge, the judge would have refused to give it.

II.

As so often happens, the prosecutor chose to imperil a good case by introducing a line of evidence that added little but was bound to be a prolific breeder of substantial claims of error—to which the remainder of this opinion must be devoted.

In order to provide a basis for understanding these claims, we must back up a bit; if the reader wonders what all

this will have to do with Leonard's case, we must crave indulgence.

The New York Regional Office of the IRS had become concerned over possible losses of United States income taxes through the use of secret Swiss bank accounts. It occurred to someone that taxpayers having such accounts might be identified by their receipt of statements from the banks. However, detection was impeded by the fact that, in the interest of secrecy, the Swiss banks used envelopes not bearing the banks' names or return addresses. Some agents penetrated this shield by writing various Swiss banks about establishing accounts and observing the postal meter numbers on the answers. Armed with these numbers, IRS requested the Postal Service, in a communication not in the record, for permission to conduct a mail cover during the first four months of 1968. On the evenings of about 60 days during that period, a Postal Inspector and IRS Special Agents, working at the main New York City Post Office, photostated with high speed copiers the faces of all air mail envelopes without return addresses mailed from Switzerland to New York.[4] Thereafter postage meter numbers on these photostats were examined to see if any matched those known to have been used by Swiss banks. This group, which amounted to thousands of envelopes, was converted into a print-out containing the recipients' names, addresses, dates of envelopes and the identities of the banks. From the several hundred names in the print-out, B. H. Morris, a Senior Regional Analyst·in the office of the Assistant Regional Commissioner of Audit, and Special Agent Boller selected a group of 100 in the Manhattan and about 50 in the Brooklyn District. Leonard, whose name appeared in the larger sample and whose return had already been selected for audit because of a development described below, was added to the list, along with a few others similarly situated. In 1969 the procedure was repeated. All this was known as the Foreign Bank Account (FBA) Project.

We now turn to another development. In early 1968 the IRS had received an informer's report that Leonard had been getting kickbacks from a subcontractor. Although the report came originally to the Intelligence Division, which handles criminal investigations, it was referred, in accordance with usual procedures, to the Audit Division, which it reached on April 16, 1968. On June 7th the Manhattan District Director advised Leonard that his 1966 personal income tax return had been assigned for examination to revenue agent Rothstein.

Rothstein was not one of the special group of revenue agents who had been selected to pursue investigations emanating from the FBA project. On August 7, 1968, Leonard's audit was reassigned to revenue agent Mortimer Laski. In accordance with normal procedures, Laski also audited Leonard's 1965 return and, when the ordinary post-filing processing was completed, the 1967 return.

The audit began in normal fashion with an examination of Leonard's papers—including the UCC contract with the 10% override provision deleted by a hand inked line—at the office of his accountant. Sometime early in 1969, Laski met Leonard at the accountant's office. Laski did not advise Leonard of his right to refrain from answering incriminating questions or to have counsel. Laski inquired about the UCC payments; Leonard claimed that the provisions of the contract relating to the $37,000 monthly payments, and the 10% overrides, had been changed. When asked, in accordance with prescribed procedures in FBA investigations, whether he had foreign bank accounts, Leonard said he had none except for one in an Australian bank. Again in accordance with prescribed

---

**4.** Two machines were employed each with a capacity of 3,600 envelopes per hour. The sorting and copying process usually took only half an hour. The evidence was that delivery of the mail was not delayed since the mail arrived late in the afternoon or early in the evening and sorting for delivery would not begin until the next morning in any event.

FBA procedures, Laski furnished Leonard's accountant a proposed affidavit which Leonard executed on August 27, 1969; we reproduce this in the margin.[5] Agent Laski then continued his audit, particularly requesting more information from UCC. On the basis of this, Agent Laski and a successor revenue agent, on June 30, 1970, submitted a report recommending that the matter should be referred to the Intelligence Division for a fraud investigation. The recommendation was accepted, and a criminal investigation was begun with a Special Agent in charge. Thereafter Leonard was given warnings of his constitutional rights at the beginning of each interview.

We can now satisfy the curiosity of anyone who has persisted in reading so far as to what these events had to do with the case. The Government sought to prove that the statements in the affidavit that Leonard had no foreign bank accounts and had no dealings with foreign banks, with two exceptions, were false. This was not for the purpose of showing that any of the unreported UCC payments got into foreign bank accounts but simply to bolster the proof that the omissions of the 10% override payments from Leonard's 1967 and 1968 income tax returns were wilful.

The evidence was of two sorts: Harris Egan, an official at the Chase Manhattan Bank (CMB) branch on United Nations Plaza, near Leonard's apartment, testified that in April, 1968, he delivered to Leonard's apartment three official CMB checks—two checks for $20,000 and $25,000 dated April 12th and a $120,000 check dated April 26th. Three other official CMB checks for $64,000, $16,000 and $138,000 were delivered to Leonard later in the year. In all the checks to-

taled $383,000. All six checks were payable to Leonard on remittance instructions issued by Banque Cantonale de Zurich. Leonard used most of the checks to pay off a personal FNCB loan.

Eva Brooke testified that in the summer of 1971, in the course of an endeavor to hire her now deceased husband, Jack Brooke, away from his then employer, Kerr-McGee Chemical Corporation, Leonard offered Brooke $100,000 a year, half to be paid in dollars and the other half to be deposited in a Swiss bank account. Later, in answer to an inquiry from Brooke, Leonard admitted to having such an account. Since this admission in 1971 was not necessarily inconsistent with the affidavit executed in August 1969, the Government also put in evidence Leonard's 1971 income tax return, executed April 10, 1972, which contained the following question and answer:

> Did you, at any time during the taxable year, have any interest in or signature or other authority over a bank, securities, or other financial account in a foreign country (except in a U.S. military banking facility operated by a U.S. financial institution)?
>
> [Answer:] No.

Now for the flood of objections which the admission of this evidence has precipitated.

■■■■ (1) The broadest in scope is that the mail cover was an unreasonable search in violation of the Fourth Amendment; that the interrogation of Leonard about foreign bank accounts and the execution of the affidavit resulted from it; and that any false statement in the affidavit was, thus, the fruit of a poisonous tree.

---

5. JACKSON D. LEONARD, being duly sworn, deposes and says:

 1. I make the following statements in connection with the examination of my U.S. Income Tax Returns for the years 1965, 1966 and 1967.

 2. I do not now have and I have not had any foreign bank accounts. I have not had any transactions or dealings of any nature with any foreign banks or other representatives except for the following:

 (a) Nominal currency conversions for living expenses while I was travelling.

 (b) In 1968 I made use of Australian banking facilities to secure a loan which is directly related to an engineering project which I have completed in Australia.

It has been settled since *Ex parte Jackson*, 96 U.S. 727, 24 L.Ed. 877 (1878), that "The right of the people to be secure in their persons, houses, papers and effects, against unreasonable. searches and seizures" protects against a warrantless opening of sealed letters and packages, save insofar as may be needed in the case of incoming international mail for the enforcement of the customs laws. See *United States v. Odland*, 502 F.2d 148 (7 Cir.), *cert. denied*, 419 U.S. 1088, 95 S.Ct. 679, 42 L.Ed.2d 680 (1974), and cases there cited. However, this court said in *United States v. Costello*, 255 F.2d 876, 881 (2 Cir. 1958):

> We think the Jackson case necessarily implies that without offense to the Constitution or statute writing appearing on the outside of envelopes may be read and used.

Leonard counters by saying that "the mail watches which the courts have heretofore approved have all been quite limited in scope, and clearly restricted to the inspection of the mail sent to specific individuals who were reasonably suspected of having committed, or having attempted to commit, particular crimes."

It may well be that, in these days of increased concern for the protection of privacy, the statement in *Costello* should not be read as an absolute, permitting, for example, the Government to copy the outside of every envelope received by every citizen. But this case is an unattractive candidate for creating an exception. The IRS was confronted with a serious problem in the use of Swiss bank accounts to evade the revenue laws. Not too long after the mail covers here at issue, the House Report on the Bank Secrecy Act of 1970, quoted in *California Bankers Ass'n v. Shultz*, 416 U.S. 21, 28–29, 94 S.Ct. 1494, 1502, 39 L.Ed.2d 812 (1974), was to state:

> One of the most damaging effects of an American's use of secret foreign financial facilities is the undermining of the fairness of our tax laws.

6. The applicable mail cover regulations have now been republished, with some changes, in

and

> The former U.S. Attorney for the Southern District of New York has characterized the secret foreign bank account as the largest single tax loophole permitted by American law.

In 1968 and 1969 the IRS did not have the assistance now provided by the reporting requirements of Title II of the Bank Secrecy Act, 31 U.S.C. §§ 1101, 1121. Even if we assume that copying the outside of letters may in some circumstances be a "search," the 1968–1969 project improvised by the IRS did not involve an unreasonable one; indeed it involved less in the way of disclosure than the foreign reporting requirements which the Supreme Court has sustained in the *California Bankers Association* case, *supra*, 416 U.S. at 59–63, 94 S.Ct. 1494. Moreover, if the test for applicability of the Fourth Amendment is a "reasonable expectation of privacy," *Katz v. United States*, 389 U.S. 347, 360, 88 S.Ct. 507, 516, 19 L.Ed.2d 576 (1967) (concurring opinion of Mr. Justice Harlan), it is difficult to see how there can be any such reasonable expectation with respect to the outsides of incoming international mails which are subject to inspection and even in some cases to opening in aid of the enforcement of the customs laws.

(2) A second attack against the mail cover is that it could not have been lawfully authorized under the applicable Postal Regulation. The Postal Manual then in effect provided in § 861.42,[6]

> .42 The Chief Postal Inspector, or his designee, may order mail covers under the following circumstances:
>
> \* \* \* \* \* \*
>
> b. When written request is received from any law enforcement agency wherein the requesting authority stipulates and specifies the reasonable grounds that exist which demonstrate the mail cover is necessary to (1) pro-

the Federal Register. 40 Fed.Reg. 11579 (1975), *to be codified as* 39 C.F.R. § 233.2(e).

tect the national security, (2) locate a fugitive, or (3) obtain information regarding the commission or attempted commission of a crime.

Leonard argues that § 861.42b(3), the only provision that can be applicable, requires that the agency seeking permission must be engaged in the investigation of a specific crime which it has reason to think has been committed, or is about to be. Apart from the fact that the objection was not made below, we see no reason to read the regulation so narrowly. Apparently the Postal Service did not, and its interpretation of its internal regulations is entitled to weight. See 4 Davis, Administrative Law Treatise, § 30.12 at 261 & n.12 (1958).

 (3) The objection most strongly pressed is this:

Although this circuit and a majority of the others have held that *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) does not require the IRS to give the *Miranda* warnings to taxpayers not in custody, even in criminal tax fraud investigations, IRS has gone beyond its constitutional obligation. In Internal Revenue Service News Release No. 897, issued October 3, 1967, it stated, so far as here pertinent:

"In response to a number of inquiries the Internal Revenue Service today described its procedures for protecting the Constitutional rights of persons suspected of criminal tax fraud, during all phases of its investigations.

"Investigation of suspected criminal tax fraud is conducted by Special Agents of the IRS Intelligence Division. This function differs from the work of Revenue Agents and Tax Technicians who examine returns to determine the correct tax liability.

"Instructions issued to IRS Special Agents go beyond most legal requirements to assure that persons are advised of their Constitutional rights.

"On initial contact with a taxpayer, IRS Special Agents are instructed to produce their credentials and state: 'As a special agent, I have the function of investigating the possibility of criminal tax fraud.'"

. . . . .

In News Release No. 949, issued November 26, 1968, it further provided:

"One function of a Special Agent is to investigate possible criminal violations of Internal Revenue laws. At the initial meeting with a taxpayer, a Special Agent is now required to identify himself, describe his function, and advise the taxpayer that anything he says may be used against him. The Special Agent will also tell the taxpayer that he cannot be compelled to incriminate himself by answering any questions or producing any documents, and that he has the right to seek the assistance of an attorney before responding."

Three circuits have held that when a special agent has failed to give the advice described in these Releases, incriminating statements by the taxpayer will be suppressed. *United States v. Heffner*, 420 F.2d 809 (4 Cir. 1969) (one judge dissenting); *United States v. Leahey*, 434 F.2d 7 (1 Cir. 1970); *United States v. Sourapas*, 515 F.2d 295 (9 Cir. 1975).

Leonard cites various reasons why the audit must be considered as having been one "of suspected criminal tax fraud" from the outset even though it was conducted by a revenue agent and not by a special agent. These include the fact that the mail cover could be justified under the Postal Regulations only if its purpose was to "obtain information regarding the commission or attempted commission of a crime"; that special agents participated in the mail cover and in framing the instructions for the audits of the persons selected as a result; and that persons who are the subject of ordinary audits are not asked to sign affidavits as Leonard was.[7]

7. The defendant also claims that he was the subject of a criminal investigation quite apart from the FBA project, since IRS action was precipitated by an informer's tip made in the first instance to the Intelligence Division. We do not think that this fact, by itself, makes the

We are not at all sure that we would follow the *Heffner—Leahey—Sourapas* doctrine in the case of an occasional and undeliberate departure from the procedure described in the News Releases if the issue were squarely before us. It is, of course, well established that when agency action "is based on a defined procedure, even though generous beyond the requirements that bind such agency, that procedure must be scrupulously observed." *Vitarelli v. Seaton*, 359 U.S. 535, 546–47, 79 S.Ct. 968, 976, 3 L.Ed.2d 1012 (1959) (concurring opinion of Mr. Justice Frankfurter). However, *Vitarelli* and almost all of the great number of cases that have applied the doctrine have concerned the validity of the agency's own action in the face of a violation of its own regulations, see Note, Violations by Agencies of Their Own Regulations, 87 Harv.L.Rev. 629 (1974), rather than an invocation of the exclusionary rule. The latter, as Judge Clary said in a perceptive but seemingly neglected opinion many years ago, "represents an attempted accommodation of competing values." *United States v. Schwartz*, 176 F.Supp. 613, 615 (E.D.Pa.1959), aff'd on other grounds, 283 F.2d 107 (3 Cir. 1960), *cert. denied*, 364 U.S. 942, 81 S.Ct. 461, 5 L.Ed.2d 373 (1961). Judge Clary thought that, while this accommodation required exclusion when the Constitution or a statute had been violated, the balance turned the other way when an official of an agency had simply violated the agency's own regulation—something which the agency would presumably be interested in correcting for the future, as it might not be when the Constitution or a statute imposed distasteful requirements upon it. Despite persuasive contrary arguments in Judge Coffin's opinion in *United States v. Leahey, supra*, a period of increasing disenchantment with the exclusionary rule, see *Bivens v. Six Unknown Federal Narcotics Agents*, 403 U.S. 388, 412–18, 91 S.Ct. 1999, 29

L.Ed.2d 619 (1971) (dissenting opinion of the Chief Justice); *Schneckloth v. Bustamonte*, 412 U.S. 218, 266–69, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973) (concurring opinion of Mr. Justice Powell, joined by the Chief Justice and Mr. Justice Rehnquist); see also *United States v. Burke*, 517 F.2d 377, 386 (2 Cir. 1975), would not seem to be a good time for us to embrace a rule that when an agency voluntarily publishes a press release announcing that it will extend to suspects more procedural protection than the Constitution or a statute demands, any violation, however unintentional or excusable, will lead to suppression.

We find it unnecessary, however, to decide whether we would follow the cited cases. For even if we were persuaded by them, we would not reach the result urged by Leonard.

In the first place, we read the News Releases as outlining the instructions which the IRS has given to Special Agents, something that Agent Laski was not. Leonard's position thus must be that exclusion is required not only when a Special Agent fails to observe his instructions but also when IRS, mistakenly believing that the investigation has not yet become one "of suspected criminal tax fraud," does not assign a Special Agent to conduct it, or at least fails to instruct an ordinary revenue agent to act as if he were a special agent. We think this goes beyond the bounds of good sense interpretation. A different case would be presented if IRS consistently assigned ordinary revenue agents to conduct what it knew to be criminal investigations and they failed to give the warnings indicated in the News Releases, but there is no evidence of this.

Second, we do not think the investigation had become one "of suspected criminal tax fraud" when Leonard executed the affidavit on August 27, 1969. To borrow Mr. Justice Frankfurter's phrase,

Audit Division's work subject to the News Releases; despite defense counsel's earnest efforts to distinguish the case, we find the reasoning of *United States v. Robson*, 477 F.2d

13, 16–17 (9 Cir. 1973), *cert. denied*, 420 U.S. 927, 95 S.Ct. 1125, 43 L.Ed.2d 398 (1975), persuasive on this point.

*Universal Camera Corp. v. NLRB,* 340 U.S. 474, 493, 71 S.Ct. 456, 467, 95 L.Ed. 456 (1951), "we do not find ourselves pinioned between the horns of [counsel's] dilemma" that unless the mail cover was to unearth crime it was illegal under the Postal Regulations, and that if it was legal, the tax investigation of Leonard was criminal. The mail cover came within the Postal Regulations because IRS had reason to believe that crimes under the revenue laws were being committed by some taxpayers through the use of Swiss bank accounts. It does not follow that every person whose name turned up in the print-out as probably having a Swiss bank account was suspected of committing such a crime. In fact the audit disclosed no sufficient evidence that Leonard had committed a crime by having a Swiss bank account. What ultimately led Agent Laski to recommend a criminal investigation was the data furnished by UCC, which showed, not a "kick-back" as represented by the informer, but a failure to report the 10% overrides which Leonard had received.

 (4) Citing *Bronston v. United States,* 409 U.S. 352, 93 S.Ct. 595, 34 L.Ed.2d 568 (1973), Leonard next claims that the Government did not produce sufficient proof of the falsity of his affidavit, see note 5, to justify its admission into evidence. The prosecution did not offer evidence from the mail cover showing that Leonard had received communications from the People's Bank in Switzerland, although, as will be seen, the defendant elicited some evidence that at least hinted as to his having a Swiss account; the Government relied rather on the testimony of the CMB branch manager described above and, to a lesser degree, on that of Mrs. Brooke. Leonard claims that the manager's testimony did not show that Leonard personally had any Swiss bank accounts, since the numbered account at the Banque Cantonale de Zurich whence the remittance to CMB was made, might have belonged to a corporation owned by him or even to an outsider, and that Mrs. Brooke's testimony to an admission in the summer of

1971 does not sufficiently show falsity in an affidavit made in the spring of 1969. We think that this contention is valid and that if Leonard's trial counsel had requested an instruction that the jury could not find this portion of the affidavit to be false, he would have been entitled to it. However, no such request was made and the defendant is thus forced to show also that there was no falsity in the denial of "any transactions or dealings *of any nature* with any foreign banks or other representatives" (emphasis supplied). He argues that the transactions to which the CMB manager testified were between Leonard and CMB, and that therefore there is no falsity. That argument, however, seems formal to an extreme; it is more reasonable to say that in fact Leonard had had such dealings with a Swiss bank, and that CMB had simply been a conduit for transmission of the funds from the Banque Cantonale de Zurich. The real question is whether there was sufficient proof that Leonard knew that the money had come from a foreign bank. Since the money came from a Swiss numbered account, it is understandable that there was no direct evidence on this point; under a preponderance of the evidence standard, there was enough circumstantial evidence to entitle the jury to draw the required inference. In addition to the practical point stressed by the trial judge, that Leonard probably had a pretty fair general idea of how $383,000 was being transmitted to him, the jury could also consider the fact that Leonard had no account at CMB, the peculiar method chosen to deliver the CMB official checks to him, and the pains taken by Leonard to keep them out of his FNCB account.

Leonard further argues that the preponderance standard is not high enough for "similar act" evidence and points to statements that such evidence must be "plain, clear and conclusive" to be admissible. *Kraft v. United States,* 238 F.2d 794, 802 (8 Cir. 1956); *United States v. Broadway,* 477 F.2d 991, 995 (5 Cir. 1973). This view appears to rest on a misconception. Similar act evidence is

admitted to show wilfulness and for other purposes, not because it may indicate the commission of crime but in spite of that. 2 Wigmore, Evidence § 305 (3d ed. 1940). Insufficiency of the evidence to support submission to the jury of an indictment charging that the August, 1969, affidavit was a false statement in violation of 18 U.S.C. § 1001, does not mean that the evidence could not be received to prove wilfulness with respect to a different crime if other evidentiary rules were satisfied. While "the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged," *In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 1073, 25 L.Ed.2d 368 (1970), the "fact" here is wilfulness, not each subsidiary fact offered to establish it. *United States v. Taylor*, 464 F.2d 240, 244 (2 Cir. 1972), compare *Lego v. Twomey*, 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972). A preponderance standard is sufficient for such facts if the aggregate of the evidence on the issue of wilfulness meets the *Winship* requirement, as it plainly does here.

■■■■■■ (5) Leonard also claims that the whole line of proof regarding Swiss banks and statements he made about them should have been excluded on the basis that the small probative value of the evidence was outweighed by its prejudicial potential. *United States v. Deaton*, 381 F.2d 114 (2 Cir. 1967); Fed. Rules Evid.Rule 403. The probative value of similar acts used to prove wilfulness or intent is dependent on the existence of a close parallel between the crime charged and the acts shown, 2 Wigmore, Evidence § 302 at 200–01 (3 ed. 1940). The crime here charged is the wilful subscribing of a false document under I.R.C. § 7206(1), a section of the Code which, both in its language, see

note 1, and in its history, makes knowing falsity the gravamen of the offense. *Kolashi v. United States*, 362 F.2d 847, 848 (5 Cir. 1966); 10 Mertens, Federal Income Taxation § 55A.13 at 65–69 (1970). If the jury, crediting the testimony that was offered, found that the 1969 affidavit and the statement on the 1971 tax return were false, they could properly use that conclusion to help them "in determining whether the defendant had a wilful intent to sign here a false return," as the trial judge charged. Although the fit between the similar acts and the crime for which Leonard was convicted is not so close as it has been in cases where identical forms for immediately preceding years have been introduced, e. g., *United States v. Coblentz*, 453 F.2d 503 (2 Cir.), cert. denied, 406 U.S. 917, 92 S.Ct. 1766, 32 L.Ed.2d 116 (1972), it is within the bounds established by some of the decided cases, e. g., our own *United States v. Kaufman*, 453 F.2d 306 (2d Cir. 1971).[8]

There remains, however, the question whether the value of the evidence is "worth what it costs." McCormick, Evidence § 185 at 438 (2 ed. 1972). It is true that transacting business with Swiss banks, or lying about not having done so, is rather more likely to "arouse the irrational passions of the jury" than was evidence of the claiming of an improper deduction in an income tax return in *United States v. Kaufman, supra*. At the same time, we think that the defendant has overstated the case in claiming that this line of proof was "highly inflammatory." The evidence was hardly the equivalent of a bloody shirt, compare *State v. Goebel*, 36 Wash.2d 367, 379, 218 P.2d 300, 306 (1950), a dying accusation of poisoning, *Shepard v. United States*, 290 U.S. 96, 104, 54 S.Ct. 22, 78 L.Ed. 196 (1933), or a claim of homosexuality, *United States v. Provoo*, 215 F.2d 531,

---

**8.** The Government's brief chides Leonard for having "utterly failed even to inform this Court of the District Court's stated, independent ground of admissibility—that both the 1969 affidavit and the 1971 return are false exculpatory statements—and of the authorities supporting that ground, which were cited and relied upon below." We agree with counsel for Leonard that this claim is frivolous and that the cases are not in point.

537 (2 Cir. 1954). Moreover, defendant's counsel at trial must not have considered it to be that damaging, for he was willing to bring out additional allegations of foreign bank connections if they could be used for his own purposes. The prosecution did not introduce evidence that Leonard had been identified for investigation as part of the FBA project and indeed, objected to the introduction of that information. Nevertheless defense counsel went into the matter, apparently attempting to show, as he later argued to the jury, that Leonard was the victim of a bureaucratic steam-roller. Indeed, our impression is that in fact the defense welcomed the Government's resort to similar act testimony since this tended to distract the jury from an issue on which the prosecution's case was exceedingly strong to one on which it was considerably weaker, and also offered abundant opportunities for objection and possible reversal.

In any case, the weighing of the probative value of the evidence against its potentially prejudicial effect is primarily for the trial judge who has a feel for the effect of the introduction of this type of evidence that an appellate court, working from a written record, simply cannot obtain. We said in *United States v. Ravich*, 421 F.2d 1196, 1203–04 (2 Cir.), *cert. denied*, 400 U.S. 834, 91 S.Ct. 69, 27 L.Ed.2d 66 (1970), citing *Cotton v. United States,* 361 F.2d 673, 676 (8 Cir. 1966), and *Wangrow v. United States*, 399 F.2d 106, 115 (8 Cir.), *cert. denied*, 393 U.S. 933, 89 S.Ct. 292, 21 L.Ed.2d 270 (1968), that "his determination will rarely be reversed on appeal." It would doubtless have been wiser for the judge to have excluded the evidence or, at the least, to have excluded it until after the presentation of the defendant's case when there would have been a better opportunity to appraise the prosecution's need for it. Cf. *United States v. Kaufman, supra,* 453 F.2d at 311. We do not think, however, that the trial judge's admission of this evidence was beyond the bounds of his legitimate discretion, although it may have been close to the edge.

(6) Even this does not exhaust the claims of error arising from the course adopted by the prosecutor. Defendant raises a number of other points, with which we must deal more briefly.

■ (a) Relying on *United States v. Baum*, 482 F.2d 1325, 1331–32 (2 Cir. 1973), Leonard claims to have been the victim of unfair surprise with respect to the "similar act" evidence. *Baum* differs in several respects: The trial court had erroneously denied a request that would have disclosed the name of the surprise witness, Greenhalgh, *id.* at 1329, 1331, and had refused any continuance at all when he was called, *id.* at 1330. Here Leonard's counsel was on notice as to the Laski-Egan evidence and had obtained discovery of the CMB checks six days before they were put into evidence. Counsel had enough knowledge of Mrs. Brooke's prospective appearance to have served a *subpoena duces tecum* on the preparer of an affidavit she had signed. He also interviewed her and obtained copies of prior statements during a recess and evening after her direct testimony. Counsel's only substantial complaint is the denial of a two weeks continuance, not clearly sought until the day before the trial ended, in order to make a trip to Switzerland, Australia, or both, in an endeavor to develop proof that the $383,000 paid through CMB to Leonard might have come from the Australian bank which constituted an exception in the August, 1969, affidavit. The request was unaccompanied by any showing that this travel would be productive and the court was justified in rejecting it as a ploy.

■ (b) Many pages of the briefs are devoted to the defense's claim that the Government improperly obstructed its interviews of several IRS employees. After defense counsel had written to them, the employees apparently referred the letters to the Assistant United States Attorney who was to prosecute the case. When the employees appeared for the taking of depositions, the prosecutor and defense counsel were in agree-

ment that the interviews should be reported and that the witnesses should have an opportunity to read the daily copy and make appropriate corrections; however, defense counsel noted his dislike of the prosecutor's presence and particularly of his instructing the witnesses not to answer some ·of the questions. Defense counsel orally moved the court that the prosecutor be excluded or, in the alternative, be directed not to tell the witnesses not to answer questions. The court denied the motion; the Government later supplied, as promised, affidavits by the agents in which they dutifully stated that they "would have declined the interview unless permitted to be counseled, advised and guided by the Assistant United States Attorney assigned this case."

The question how far the prosecution may go in discouraging witnesses from being interviewed by defense counsel has received increasing attention since the decision in *Gregory v. United States,* 125 U.S.App.D.C. 140, 369 F.2d 185, 187–89 (1966), although this circuit does not seem to have dealt with the issue. See *United States v. White,* 454 F.2d 435, 438–39 (7 Cir. 1971), *cert. denied,* 406 U.S. 962, 92 S.Ct. 2070, 32 L.Ed.2d 350 (1972); *United States v. Matlock,* 491 F.2d 504, 506 (6 Cir. 1974), *cert. denied,* 419 U.S. 864, 95 S.Ct. 119, 42 L.Ed.2d 100 (1974); ABA Standards Relating to the Administration of Criminal Justice, The Prosecution Function, § 3.1(c); Discovery and Procedure before Trial, § 4.1; Kamisar, LaFave and Israel, Modern Criminal Procedure 1236–37 (1974 ed.). None of these discussions, however, has focused on a situation like that here presented, where the persons sought to be interviewed are government employees who in some sense are part of the prosecutorial team; where most of the disclosure sought relates to the internal workings of a government agency; and where the agency has established procedures in regard to disclosure, 26 C.F.R. § 301.9000–1(c) and (d), which have apparently been ignored. Indeed the method devised by Leonard's trial counsel seems more like

an ingenious way for getting around the limitation of discovery in the last sentence of F.R.Cr.P. 16(b).

This case. does not require us to decide issues of such importance, for on this record we fail to see how the defendant has been prejudiced in any significant degree. The prosecutor intervened primarily to prevent answers being given to questions directed to what the judge called "talks between the agents themselves, 'What did you say to each other about the Leonard case?'" Such relevance as there might be in such answers would relate mainly to the suppression hearing, as to which the need for interviews beforehand is much less than in the case of a jury trial. The prime example of obstruction cited by Leonard's counsel consists of the prosecutor's instructing Special Agent Shulman not to answer broad questions concerning what he had done in "the investigation" from March or April, 1972, until June, 1972, and what further. steps he had taken after July, 1972. The relevance of this is not self-evident, and the defendant has not clarified the matter for us. The interview with revenue agent Laski, the only agent who testified at trial, runs over fifty-seven typewritten pages and was relatively free of interruptions by the prosecutor; Leonard has not shown how the few negative instructions given by the prosecutor impeded effective cross-examination.

■■■ (c) Counsel makes a variety of attacks, unnecessary to detail, on the methods by which the prosecution secured the presence of Mrs. Brooke. Apart from the fact that it is not clear that these objections were raised below and that they are of doubtful merit, the short answer is that impropriety in the method by which the prosecution has obtained the attendance of a witness, while a proper subject for cross-examination or proof insofar as the impropriety may go to the weight of the witness' testimony, is not of itself a ground for reversal.

\* \* \* \* \* \*

We have considered the other arguments made by Leonard's indefatigable appellate counsel but do not believe they warrant prolongation of this opinion.

The judgment of conviction is affirmed.