**UNITED STATES of America, Appellee,**

v.

**Jack NATHAN, Appellant.**

**No. 964, Docket 75–1421.**

United States Court of Appeals, Second Circuit.

Argued March 25, 1976.

Decided June 16, 1976.

Nathan Lewin, Miller, Cassidy, Larroca & Lewin, Washington, D.C. (Jamie Gorelick, Miller, Cassidy, Larroca & Lewin, Washington, D.C., on the brief), for appellant.

Frank H. Wohl, Asst. U. S. Atty., New York City (Robert B. Fiske, Jr., U. S. Atty., S.D.N.Y., Alan Levine, Lawrence B. Pedowitz, John C. Sabetta, Asst. U. S. Attys., New York City, of counsel), for appellee.

Before LUMBARD, OAKES and TIMBERS, Circuit Judges.

OAKES, Circuit Judge:

This appeal is from a judgment of conviction entered in the United States District Court for the Southern District of New York, before Dudley B. Bonsal, *Judge.* After a six-day trial, the appellant, Jack Nathan, was found guilty on four counts of evasion of personal income taxes, 26 U.S.C.

§ 7201,[1] and sentenced to concurrent terms of nine months' imprisonment and a fine of $10,000 on each count.

■ The tax evasion scheme proved at trial was simple and direct in its conception. The appellant owned and operated a bill collection agency, Nathan, Nathan & Nathan, Ltd., in New York City. The agency business was collection of delinquent customer accounts owed to hotels and other clients. The collection receipts obtained by the agency were deposited in full in the firm's own bank account. A fee of approximately 35 per cent was retained by appellant's agency, and the balance was remitted to the client by a check carried on the firm's books as a "refund." The Government proved at trial that the firm, at appellant's direction, employed two devices to understate its income[2]: (1) "refund" checks written to clients were carried on the books as expenses, even though in many cases the checks had not been cashed three or more years after they were allegedly mailed to the clients; (2) checks made out to client hotels which were not "refunds," but for which the appellant had received cash from the hotels, were treated as "refund" checks on the agency's books and charged as expenses. By the end of 1970, approximately $50,000 of income had been concealed in stale "refund" checks, and during the period of 1967 through 1970, approximately $36,000 of cash was siphoned out of the agency through Nathan's cashing of putative "refund" checks at the client hotels.

Appellant raises the following claims at this appeal: (1) the evidence that appellant "willfully" evaded payment of his income taxes, *see* note 1 *supra,* was insufficient to warrant submission of the case to the jury; (2) the defense was prejudiced by an erroneous exclusion of a taped conversation tending to show that the proceeds of checks cashed by appellant at client hotels were used to pay "gratuities" to the credit managers at those hotels; (3) use by the Government of charts which summarized portions of the evidence, without appropriate cautionary instructions, was prejudicial error; and (4) participation in the interrogation of witnesses by the trial judge indicated to the jury that the judge was biased in favor of conviction. We reject each of these arguments and affirm the judgment of the trial court.

■ There is ample evidence of appellant's willful evasion of taxes to support the conviction. An accountant formerly employed by appellant, Allan Edwards, testified that he had informed Nathan that the stale "refund" checks should be written off the agency's books and that as an accountant he could not prepare the appellant's tax returns unless the appropriate adjustment were made. Nathan then fired Edwards, allegedly for cause,[3] though the jury could well have believed Edwards was fired because of appellant's desire to conceal his income. A second accountant, Sanford Katz, hired to succeed Edwards, also testified that appellant was aware of the mounting sum of stale "refund" checks carried on the agency's books. From this evidence the jury could well conclude that appellant willfully engaged in conduct which concealed his income. Nathan did not testify and the defense presented no witnesses.

1. 26 U.S.C. § 7201 provides that:
Any person who willfully attempts in any manner to evade or defeat any tax imposed by this title or the payment thereof shall, in addition to other penalties provided by law, be guilty of a felony and, upon conviction thereof, shall be fined not more than $10,000, or imprisoned not more than 5 years, or both, together with the costs of prosecution.

2. Since the collection agency was organized as a Subchapter S corporation during the period covered in the indictment, the profits of the firm constituted income to the appellant. 26 U.S.C. § 1373. Therefore, his willful participation in a scheme to understate the agency's profits constitutes evasion of his personal income taxes under 26 U.S.C. § 7201, *see* note 1 *supra.*

3. Appellant claims that Edwards was fired because he had failed to prepare Nathan's income tax returns on time and had assigned junior employees to work on the account rather than doing the returns himself.

■ The evidence of willful evasion of taxes with regard to appellant's cashing of "refund" checks at client hotels is equally forceful. These amounted to 100 checks aggregating $36,120 during the tax years in question, 1967–70. The stubs for and the face of these checks looked just like genuine "refund" checks (although the reverse side of the checks carried a different endorsement). Both Edwards and Katz had been led to believe that these checks were "refund" or "client" checks, and appellant never gave contrary instructions, told his accountants that he was obtaining cash for the checks at the client hotels, or made any other entries on the stubs or face of the checks which he generally drew himself. This circumstantial evidence of willful evasion of taxes was sufficient to allow the case to go to the jury. The appellant has argued that the Government failed to show that Nathan did not use the cash proceeds of these checks for business purposes (*i. e.,* "gratuities" and entertainment for client credit managers). While "the ultimate burden of persuasion remains with the Government" on the issue whether *net* taxable income was understated by the taxpayer, *United States v. Leonard,* 524 F.2d 1076, 1083 (2d Cir. 1975), *cert. denied,* —— U.S. ——, 96 S.Ct. 1737, 48 L.Ed.2d 202, 44 U.S.L.W. 3621 (1976), we agree with Judge Coffin that "[t]he applicable rule here is that uniformly applied in tax evasion cases—that evidence of unexplained receipts shifts to the taxpayer the burden of coming forward with evidence as to the amount of offsetting expenses, if any." *Siravo v. United States,* 377 F.2d 469, 473 (1st Cir. 1967).

■ In this case, moreover, as in *United States v. Leonard, supra,* the defense that the check proceeds were used to pay legitimate business expenses was not sufficiently raised in the evidence to require the trial court to instruct the jury on this possible defense. The only evidence regarding cash gratuities introduced at trial was from Jo-

seph Mazzurco, the credit manager at the Waldorf Astoria, who admitted receiving between $200 and $500 in cash per year from appellant. No nexus between these payments and the proceeds of the challenged checks appears in the record; even if it did appear, the sums involved fall far short of explaining any material portion of the approximate $9,000 cash per year appellant was obtaining out of agency earnings through the cashing of the bogus "refund" checks. All of the checks were cashed at three New York hotels. Even assuming that each of the credit managers at these hotels were receiving cash "gratuities" of $200 to $500 per year from appellant, this accounts for no more than one-sixth of the cash proceeds obtained by Nathan for the checks. There is not the slightest hint in the record as to a legitimate business usage for the remaining bulk of the cash proceeds of these checks. In these circumstances, it was proper for the trial court to refuse to instruct the jury that if the check proceeds had been wholly paid out for business purposes there was no evasion of income. *See United States v. Leonard, supra; United States v. Gross,* 286 F.2d 59, 61 (2d Cir.), *cert. denied,* 366 U.S. 935, 81 S.Ct. 1659, 6 L.Ed.2d 847 (1961).

■ Appellant claims that a taped conversation between appellant and Leonard Groppe, the credit manager at the St. Moritz Hotel, indicating receipt of gratuities by the latter, was improperly excluded. However, the tape was only temporarily excluded during appellant's cross-examination of Groppe pending proper identification of the scope and contents of the tape. It is quite plainly within the trial court's discretion to avoid delays in the trial by requiring counsel who does not have his evidentiary material in workable order to proceed with examination of a witness rather than to bog down the trial by a lengthy, awkward in-court attempt to straighten matters out, here selecting portions of a tape for playback.[4] The defense was invited to offer the

---

4. When the defense offered the tape in evidence it was unable to identify the portion of

the tape it intended to play back. The following colloquy took place at the side bar:

tape again whenever it had ascertained what portions of what conversations on the tape it sought to have admitted in evidence. The defense's omission to make a subsequent offer deprives it of grounds for attacking the trial court ruling on this appeal. Any error, had there been one, was rendered harmless by the open opportunity to offer the tape once it was properly prepared for use. *See United States v. Badalamente,* 507 F.2d 12, 22 (2d Cir. 1974), *cert. denied,* 421 U.S. 911, 95 S.Ct. 1565, 43 L.Ed.2d 776 (1975).

 Appellant objects to the Government's use of two large, "outsized" charts to summarize the evidence concerning the number and amount of the various checks improperly charged against the agency's income. Admission of charts for the purpose of summarizing facts contained in other exhibits was entirely proper. *United States v. Silverman,* 449 F.2d 1341, 1346 (2d Cir. 1971), *cert. denied,* 405 U.S. 918, 92 S.Ct. 943, 30 L.Ed.2d 788 (1972).[5] Appellant complains, however, that the trial court failed to instruct the jury that the charts were not themselves evidence and should not be con-

sidered as such. At the time the first of the two charts was introduced, however, Judge Bonsal instructed the jury that it was

merely a chart . . . which contains the information as to these various checks, Exhibits 31 to 145. The checks themselves are in evidence, the chart is merely to help you as a pictorial representation.

This instruction conveyed to the jury the substance of the cautionary instruction required by *Holland v. United States,* 348 U.S. 121, 128, 75 S.Ct. 127, 99 L.Ed. 150 (1954), and *United States v. Goldberg,* 401 F.2d 644, 647–48 (2d Cir. 1968), *cert. denied,* 393 U.S. 1099, 89 S.Ct. 895, 21 L.Ed. 2d 790 (1969). It is true that while the judge indicated that in his final charge he would again caution the jury as to the limited function of the charts, he inadvertently neglected to do so.[6] But viewing the entire trial as a whole, it is apparent that this inadvertence did not prejudice appellant, a conclusion fortified by the lack of a specific contemporaneous objection at the close of the court's charge. *See* Fed.R.Crim.P. 30;

---

The Court: What's the date of the tape?
Mr. Bender: I have to check it. I have to check it. I have to find out.
The Court: Find out.
(Pause.)
Mr. Bender: 5/21/74.
The Court: And who initiated the call?
Mr. Bender: I think he said that he called.
The Court: But I don't know if that's the one that you have the tape on.
Mr. Bender: I think he said he did.
The Court: You must know who initiated the call.
Mr. Bender: I wish I did. I can find out.
(Pause.)
Mr. Bender: Mr. Nathan says that the witness called him.
[Two portions of the tape were then played.]
The Court: That's what I am looking for. Where is the beginning?
The Defendant: Excuse me, your Honor, I believe at the end of this we will go open [sic] to the other. I believe so. I haven't played these things—
The Court: You think this is a different conversation?
The Defendant: Yes, sir.
[Tape played.]
The Court: I am trying to get the beginning of the one that you had before. You don't know?

The Defendant: No, I don't know.
The Court: Gentlemen, what I think I am going to do with this thing, I am not going to put this on now. I will let you cross-examine him about the content and if during the defendant's case you get this straightened out, you find out what conversations are what and who originated them and you will want to put them on in the defense case, that will be all right, and if it is necessary to recall the witness we can do that, but I think on the present state I am not going to permit this to be presented to the jury now.

5. Appellant claims that the charts used by the Government were prejudicially large. Their size, three feet by seven and one-half feet, was no greater than necessary to convey the information (dates, amounts, exhibit numbers, etc.) on the 115 checks referred to in GX 336 or the 138 stubs referred to in GX 338, and the type size of less than one inch is plainly proper in the light of the requirement that the jury be able to read it. We take it that juries are not so unsophisticated as to be likely to be misled by the size of a courtroom chart, in any event.

6. Both sides had requested the charge and Judge Bonsal had indicated that a charge to that effect would be made.

*United States v. Bermudez,* 526 F.2d 89, 97 (2d Cir. 1975).

The final argument raised is that Judge Bonsal's participation in the examination of several witnesses betrayed a prejudice favoring conviction which deprived appellant of a fair trial. Appellant has indicated 17 instances where the trial court intervened in the defenses's examination of witnesses to ask clarifying questions. The Government has also cited several places in the record where Judge Bonsal raised objections on behalf of the defense, and interrupted or curtailed the Government's examination of witnesses. We are satisfied upon examination of the entire record that Judge Bonsal conducted the trial fairly and impartially.

Judgment affirmed.