**UNITED STATES of America, Appellee,**

v.

**Chaim KAHAN, Solomon Wercberger and Mor Wercberger, Defendants-Appellants.**

**No. 1430, Docket 77–1216.**

United States Court of Appeals, Second Circuit.

Argued Aug. 15, 1977.

Decided March 7, 1978.

---

924

Milton S. Gould, New York City (Shea, Gould, Climenko & Casey, Ronald H. Alenstein and Lawrence B. Sutter, New York City, of counsel), for defendants-appellants.

Paul F. Corcoran, Asst. U. S. Atty., Brooklyn, N. Y. (David G. Trager, U. S. Atty. and Bernard J. Fried, Chief Asst. U.

S. Atty., Brooklyn, N. Y., of counsel), for appellee.

Before VAN GRAAFEILAND and WEBSTER,* Circuit Judges, and DOOLING,** District Judge.

DOOLING, District Judge.

At about 9:00 P.M. on March 11, 1975, a Time D.C. tractor-trailer carrying 6,910 cartons of Schick products interstate was highjacked in Parsippany, New Jersey. On March 12th, 1784 cartons of the products were delivered to the S & F Warehouse, and 1673 (or 1654 or 1606) cartons were delivered to the CBS warehouse, operated by the three defendants. On March 13th, at least 3,032 of the Schick products were delivered to CBS warehouse. Agents of the Federal Bureau of Investigation watched the delivery, and, after it was completed, seized 5,072 cartons of the Schick products at the CBS warehouse under a search warrant obtained while the Agents had the warehouse under surveillance. The defendants have been convicted of unlawfully receiving and possessing 5,072 cartons of Schick products stolen from an interstate shipment knowing the same to have been stolen. They were acquitted of a count charging them with conspiring to receive and have in their possession the cartons of Schick products stolen from interstate commerce.[1]

Appellants contend that certain declarations of an alleged co-conspirator made after appellants' arrest should not have been received in evidence, that evidence suggesting that they had received stolen property under similar circumstances five weeks earlier should not have been received, and that the evidentiary fruits of the search and seizure of March 13th should have been suppressed because the affidavit on which it rested was insufficient and rested on a material misstatement of fact.

The evidence was essentially simple. Carroll Bridgeforth, the driver of the Time D.C. tractor-trailer combination, testified that he and his co-driver James Lester picked up a trailer loaded with Schick products at the New Haven, Connecticut, terminal between seven and seven-thirty on the evening of March 11, 1975, to drive it to Winchester, Virginia en route to the shipment's ultimate destination in California. At about 9:00 P.M., near the junction of Interstate Route 80 with Route 287 in New Jersey, a car forced them off the road and three or four armed men highjacked the truck at gunpoint. Bridgeforth, kept in the highjackers' car until released, with Lester, in Staten Island near midnight, testified that he heard one highjacker say to the other at about 11:30 P.M. that "the buyer was well satisfied with the load."

Paul Pollari testified that at about 7:00 or 7:30 o'clock in the evening of March 11th, Jimmy De Fillippo telephoned him to say that he had "work" for Pollari in the morning. On the next morning Jimmy De Fillippo called for Pollari at his house at 7:00 or 7:30 o'clock. He had with him his brother Patty De Fillippo and Manny Gomez. The four drove together to a truck rental station in Brooklyn and rented two straight trucks and a van. Pollari and Gomez drove one truck, Patty De Fillippo the other truck and Jimmy De Fillippo the van. They drove together to a trailer yard in Brooklyn in which there were about 30 to 40 trailers. One was a Time D.C. trailer parked midway in the yard, and not visible from the street. When Pollari, Gomez and the De Fillippos reached the yard, Joe De Luca and Vinnie (Jimmy) Santa were al-

---

* Judge Webster (of the 8th Circuit, sitting by designation) having resigned, this decision is rendered by Judges Van Graafeiland and Dooling, who are in agreement, pursuant to the Rules of this Court, § 0.14(b).

** Of the Eastern District of New York, sitting by designation.

1. The alleged co-conspirators were defendants Manuel V. Gomez, Stanley Diamond, Vincent (Jimmy) Santa and Frank Joseph Maloney. Stanley Diamond entered a plea of guilty to the conspiracy count. The case against Santa and Gomez was severed and they were tried on a superseding indictment with Joseph De Luca and James and Patrick De Fillippo. All five were convicted of guilty possession and conspiracy.

ready there. The Time D.C. trailer was opened and Pollari saw that it was packed to the back with razor blades. One of the rented trucks was backed up to the trailer and Santa, De Luca, the De Fillippos and Pollari loaded both the rental trucks full from the trailer. Santa sent Pollari and Gomez with their truckload to the S & F Warehouse on Flushing Avenue near the Navy Yard with a sketchily filled out "Shipping Order" copy of a bill of lading not indicating any carrier, but reciting that the goods had been received at Clinton, Connecticut from Schick and were "Consigned to International Trading Co.", at the "Destination S & F Warehouse", by the "Route Building 77," and naming as the "Delivery Carrier—Brooklyn Navy Yard". The description of the article was "Razors & Blades" followed by "Hold for Shipment". There was no shipper or carrier signature on the document. When Santa sent Pollari and Gomez to S & F Warehouse, he told Pollari, who had expected to go with Jimmy De Fillippo, that De Fillippo was going to CBS with the other rented vehicle. Gomez and Pollari drove to the S & F Warehouse and unloaded their truck until about 5:30 in the afternoon; they then left with about a quarter of the load still on the truck.[2] Pollari and Gomez drove back to the lot, found Santa and De Luca there, and refilled the rented truck they were driving from the Time D.C. truck. The De Fillippo brothers had not yet returned. Santa instructed Pollari and Manny to park their loaded truck at Gomez's house overnight and to go to CBS the following morning. That evening Pollari called Special Agent Pecoraro of the FBI and informed him of what was going on.[3] The next morning Gomez and Pollari drove their loaded truck to the CBS warehouse in Brooklyn. There the three defendants came out, looked into the truck, supplied the truckmen with skids, and showed them how to stack the cartons so that they would not fall. Later the De Fillippos arrived

with Schick products and they too were unloaded and all the Schick cartons were taken by fork-lift truck and elevator into the CBS warehouse. The unloading of the truck and vans was not completed until 3:00 or 4:00 o'clock in the afternoon. The rented vehicles were returned and then Pollari and the De Fillippos went to the house of "Tommy Reel" and there met De Luca, Santa and one Stabino. Santa then told Pollari that "the FBI had hit the place, CBS, ten minutes after we left," but, said Santa, "we have nothing to worry about, it's on their end." Santa then paid $700 to Pollari and each of the De Fillippos.

The CBS warehouse had been under FBI surveillance from about nine o'clock on the morning of March 13. The Special Agents had learned of the Time D.C. theft by teletype on March 12, 1975, and had specification numbers of the products that had been on the trucks. They observed the Schick products being unloaded from the rented trucks and saw the defendants receiving the stolen goods; they could see that products being unloaded were Schick products, and Agent Pecoraro knew and recognized Pollari and Gomez. While the Special Agents were watching the delivery of the Schick products, a search warrant was obtained and the Agents executed the warrant. 5072 cartons of Schick products from the Time D.C. truck were located on the premises. Defendants Kahan and Mor Wercberger were to some extent interviewed. Defendant Kahan said that he had documents for the 1673 cartons of Schick products received on March 12th and Mor Wercberger produced a uniform straight bill of lading for 1654 packages of "Razors and Blades". The bill of lading differed from the one Santa had given to Pollari to cover the S & F delivery on the preceding day only in reading "Destination c/o CBS Warehouse, Route Foot of 50 *St* " rather than "Destination S & F Warehouse, Route Building 77", and in reciting receipt of 1654

---

2. The FBI recovered 1784 cartons of Schick products from S & F Warehouse on March 13, 1975, together with the shipping order copy of the bill of lading identified by Pollari.

3. Pollari had been working with Special Agent Pecoraro as an informer for a "couple" of years.

packages. Defendant Mor Wercberger also produced a CBS form of bill of lading, a copy of which, he said, he had issued to the truckman on March 12, 1975. It recited that an unnamed carrier had received from CBS Warehouses, Inc. "1 load blades" consigned to "INT Trucking"; it was signed by defendant Mor Wercberger.

No carrier document purported to cover the receipt by CBS of 3,032 cartons of Schick products on March 13th. Mor Wercberger produced the original of a straight bill of lading on the CBS form, reciting an unnamed carrier's receipt from CBS of "3032 car.", described as "3 loads" consigned to "Int'l Trucking".

Further documents related to the March 12th delivery included an unsigned handwritten receipt on a CBS form which recited the receipt from an unnamed person of 1606 cartons of Schick products, a signed typewritten receipt form of CBS Warehouses, Inc., dated March 13th, for 1606 cartons of Schick products received for account of International Trucking Co., and typewritten inventory cards covering the 1606 cartons. However, nothing was produced for the 3,032 cartons delivered on March 13th except the incomplete straight bill of lading on the CBS form. Neither defendant Kahan nor defendant Mor Wercberger could identify International Trading Company; Mor Wercberger said that he was not familiar with the company and had never before done business with it. After his arrest, Mor Wercberger produced from his wallet a statement of Tereza Merchandising Corp. (unrelated to the present case) on the back of which there was a handwritten list of 3,290 cartons of Schick products. Mr. Wercberger testified that he made up the list on the loading dock at CBS on March 13th before the drivers left, but did not put the descriptive detail of the list on the bill of lading form because truckmen are interested only in getting a receipt for the right number of packages. The numbers on the list and on the bill of lading form, however, are not in agreement.

The cartons of Schick products delivered on March 12th and 13th to the S & F and the CBS warehouses were returned to Time D.C. and by Time D.C. were returned to Warner Lambert, the manufacturer of the Schick products. The Warner Lambert return record accounts for 6905 of the 6910 cartons that had been on the highjacked truck; seven cartons were recorded as retained by the FBI. The evidence was that the manufacturer's cost of the product was over $81,000 and its invoice price to the trade was over $248,000.

Five weeks earlier the FBI had visited CBS in connection with a report that goods allegedly stolen from Whitehall Laboratories were in the CBS warehouse. A Special Agent testified that on February 4, 1975, after the FBI had been advised of the Whitehall theft, agents of the FBI went to the CBS warehouse, advised Mor Wercberger that part of the stolen Whitehall products were believed to be located in the CBS warehouse, and he requested and received his permission to search that warehouse for the Whitehall products, and found a large quantity of them. Mor Wercberger supplied to the FBI the shipping order copy of a handwritten bill of lading; again, the instrument gave no carrier's name and recited that the products had been received at an unindicated place on "2–1–1975" from "Whitehall Labs Inc.", "Consigned to A. Perez, Destination San Paulo, Brazil, Route C/O C.B.S. Warehouse Foot of 50 St. Brooklyn, N.Y.". "Delivering Carrier" line was blank. The form was dated "2/3/75" in the space provided for describing the articles shipped; it listed 976 packages of Whitehall products.[4] The delivery arrived at CBS on February 3, 1975, Mor Wercberger testified, and the consignee, A. Perez, was unknown to him.

The Government showed that Whitehall Laboratories had shipped a large quantity of Anacin, Dristan and other products via

---

**4.** The 976 cases of seven product varieties listed on the "A. Perez" *shipping order* corresponded to the entire number of seven of the product items on the Whitehall transfer in-

voice; that is, the articles located at CBS included all of the Anacin, Neet and "Prep H" items on the transfer invoice, and included none of the remaining eleven items.

National Farms Lines from its Hammonton, New Jersey, plant to its Dallas, Texas, warehouse on January 30, 1975. The shipment comprised 2,250 cases of proprietary drugs and toilet preparations weighing 36,804 pounds. The shipment did not reach Dallas, Texas. The Whitehall products were taken from the CBS warehouse on February 5, 1975 under a search warrant with the consent of defendants. All the packages seized from CBS, except five packages retained by the FBI, were returned to Whitehall on February 6, 1975, by the FBI through Laurel Hill Trucking Company.

Mor Wercberger testified that the original of the Whitehall bill of lading was never presented to CBS, and the goods allegedly consigned to A. Perez were never demanded from CBS by anyone—other than the FBI.

The Government produced the evidence of a handwriting expert that the bill of lading covering the Whitehall products allegedly consigned to A. Perez, the bill of lading covering the 1654 packages of razors and blades consigned to International Trading Co. c/o CBS Warehouse and the bill of lading covering 1784 razors and blades consigned to International Trading Co. at S &' F Warehouse were all written (or printed) by the same hand, as was an exemplar furnished as being that of one Frank Joseph Maloney.

The Government showed through a witness from the car rental company that Manny Gomez had rented an automobile on March 10th and returned it on March 21st. The Time D.C. driver, Bridgeforth, said that the rental car resembled the highjackers' car. Bridgeforth had recalled that the car's license plate contained the numbers 538. The license place of the car leased to Manny Gomez was 738 ZAO.

The defendants testified. Mor Wercberger testified that he was treasurer of CBS, that it had been in business for two years at the time in question, that Chaim Kahan was president and Solomon Wercberger was secretary of CBS and that Mor and Solomon Wercberger were brothers. Mor Wercber-

ger testified that CBS did receive the shipments of Schick products on March 12 and 13, 1975, but did not know that the goods were stolen. He said CBS had been expecting from Tereza Merchandising Corp. a shipment, which would include razor blades of an unknown kind, in a quantity large enough to fit into a 20-foot container; that, when the Schick products arrived, he figured they were from Tereza. Since the Schick products arrived as loose cartons, not palletized as Tereza's goods usually were, he said that he telephoned to Tereza while the Schick products were still being unloaded and complained about the mixture of stock styles. Tereza told him, Mor Wercberger further testified, that they were not to expect Schick products from Tereza but Wilkinson blades. Mor Wercberger testified that CBS did receive a Wilkinson blades shipment later. He testified that because the shipment contained only 1,606 cartons he refused to countersign the bill of lading, which listed 1,654 cartons. Instead, he said, he gave his own bill of lading form to the truck driver covering "1 load blades" without specification of any number of cartons. The inventory cards for the March 12 delivery, he said, were prepared on the morning of March 13 before the arrival of the FBI.

Mor Wercberger denied he or CBS purchased the Schick products received on March 12th and 13th and denied that he or CBS engaged in business as a dealer, wholesaler or retailer of goods. He testified that neither the consignee named in the instruments relating to the two deliveries of Schick Products nor anyone else came forward to demand the Schick products of CBS—other than the FBI.

Mor Wercberger sought to explain his failure to draw any inference from the manifold irregularities in the documentation covering the Whitehall and Schick product deliveries by producing a number of other shipping documents that were, in one or another respect, imperfectly completed. They certainly demonstrated that there had been other instances of careless practice, but none exhibited the extremes of

irregularity that characterized the deliveries of February 3d, March 12th and March 13th, nor the marked differences between the number of packages delivered and number listed in the purported documentation, nor such a sequence of self-evidently suspicious deliveries as those of March 12th and March 13th. The last mentioned circumstance is particularly significant because Mor Wercberger and Chaim Kahan testified that they did not expect the March 13th delivery, even after the March 12th delivery was made.

The evidence amply supported the conviction on the substantive charge of receiving goods which have been stolen while moving as an interstate shipment of freight, knowing them to have been stolen. The appellants' contention is that the conviction is tainted by the admission of evidence that was timely objected to and should have been excluded.

1. It is argued that the motion to suppress the evidence seized on March 13th under the search warrant should have been granted because the affidavit upon which the warrant was granted was insufficient on its face and, in addition, contained a material misstatement of fact.

Chief Judge Mishler denied appellants' pre-trial motion in a written opinion. The affidavit, dated March 13, 1975, was made by Special Agent Patrick Colgan. It stated that Colgan had reason to believe that there was concealed in the CBS warehouse a quantity of cartons bearing the name Schick, Inc., with the Spec. No. 02–40 on the cartons which had been stolen from interstate commerce. The supporting facts Colgan recited were (1) a report from Lester, a Time D.C. employee, that a Time D.C. trailer was highjacked on March 11, 1975 and 6910 cartons of Schick razors and toilet products were taken, which cartons were being shipped from West Haven, Connecticut to Anaheim, California and (2) that a reliable confidential informant (who had previously supplied information to the FBI which led to the arrest of one individual for theft of $75,000 worth of stolen merchandise and whose information also led to the

recovery of approximately $25,000 of highjacked property and the arrest of two individuals in connection with that highjacking) had stated that he was in the CBS warehouse on March 12th and while there observed several thousand cartons of Schick super two-bonded razors bearing the Schick, Inc., Spec. No. 02–40 cartons.

■ The affidavit is sufficient if it is read as saying that the informant saw in the CBS warehouse the same cartons that the Time D.C. driver had reported as stolen from his truck on the preceding day. The argument made is that, concededly, "Spec. No. 02–40" does not identify particular lots of products but only a product variety, and, hence, it could not fairly be inferred that the cartons seen at CBS were those stolen on the previous day. But, as the Court said in *United States v. Ventresca*, 1965, 380 U.S. 102, 109, 85 S.Ct. 741, 746, 13 L.Ed.2d 684: "The affidavit in this case, if read in a common sense way rather than technically, shows ample facts to establish probable cause and allow the [Magistrate] to issue the search warrant." Here, the affidavit is in the strongest possible form. It is based on the victim's description of the goods stolen from him and an eyewitness statement that he saw the described goods in the place to be searched. There is no contention that the informant, the affiant or the Magistrate had before them anything to make them suspicious that the description lacked ultimate specificity. *Cf. United States v. Gomez Londono*, 2d Cir. 1977, 553 F.2d 805, 810–811. Had they noted the abstract possibility that the description "super two bonded razors bearing the Schick, Inc., Spec. No. 02–40 on the cartons" was not necessarily a precisely specific identification, the warrant must have issued on the probable cause implicit in a successful informant's report that he had seen several thousand Schick cartons in a Bush Terminal warehouse on the day following the highjacking of 6910 such Schick cartons. *Cf. United States v. Viggiano*, 2d Cir. 1970, 433 F.2d 716. Judge Aldrich pointed out, in *Vitali v. United States*, 1st Cir. 1967, 383 F.2d 121, 122 that

"Where goods are of a common nature and not unique there is no obligation to show that the ones sought (here a substantial quantity of [Speidel] watch bands) necessarily are the ones stolen, but only to show circumstances indicating this to be likely."

■ *United States v. Karanthanos*, 2d Cir. 1976, 531 F.2d 26, does not point to a different conclusion. The seemingly small but, as the majority found, critically important defect in the affidavit was that the informer's statement to the affiant omitted to say how the informer learned (rather than surmised) that the aliens with whom he had been living and working had entered the country illegally: that is, the affidavit would have been sufficient if the affiant had said that the informer said that at least eight other persons working at the restaurant told him that they were illegal aliens rather than saying that the informer had said that "eight other persons known to him to be illegal aliens were employed at" the restaurant (531 F.2d at 29). The difference was precisely that between empty opinion and competent evidence. Cf. *Spinelli v. United States*, 1969, 396 U.S. 410, 418, 423, 89 S.Ct. 584, 21 L.Ed.2d 637 (concurring opinion). Here, the affiant recited as the basis of the informer's statement the informer's presence in the warehouse and his observation of the Schick products; these factors made the informer a competent witness of the facts he reported.[5] See *Spinelli v. United States, supra*, 393 U.S. at 419, 89 S.Ct. 584.

On the eve of trial the Government learned and advised opposing counsel and the court that the "informant" relied on in the affidavit—Pollari—had not been in or at the CBS warehouse on March 12th but on March 13th. Chief Judge Mishler thereupon conducted a hearing at which he heard the testimony of Special Agent Colgan, the affiant in the affidavit, and Special Agent Pecoraro, the Agent to whom Pollari reported on the evening of March 12th.

Pecoraro's testimony at the hearing was the following:

When his informant called him at 11:00 P.M. on March 12th, Pecoraro asked him if he had any knowledge of a tractor-trailer of Schick products that had been highjacked. The informant said "Peppi, we have the load." The agent asked, "Who has the load?" and the informant said, "Jimmy and Santa has it and I worked for him today unloading it." The Agent asked, "Where is the load now?" The informant answered, "It's on the location in Brooklyn. We took two loads out today, we took one to CBS Warehouse and took two to Brooklyn Navy Yard to S & F". Asked who was working with him, the informant said Jimmy and Patty De Fillippo and Manny Gomez, and he mentioned Joe De Luca, though not as one of the deliverers. The informant said also that on the next day he was going to take another load to CBS Warehouse. Pecoraro, with two other agents, met the informant the next morning; the informant reiterated that the Schick Products were being unloaded from a Time D.C. trailer, that a portion of the load had gone to CBS and a portion to S & F and that he and his associates were going to deliver the remainder of the load to CBS. The informant has also said that he had seen the number 0240 on thousands of the Schick cartons. Pecoraro and agent Dowd went to CBS and at about 11:45 P.M. saw Pollari and Gomez arrive in the rented truck and unload Schick products to the CBS loading deck.

Pecoraro interpreted his informant's words as meaning that he had participated in the first CBS delivery on March 12th, and he discovered his error only on the Friday before the trial started. Pecoraro called Colgan twice on the morning of

---

5. *United States v. Roth*, 7th Cir. 1967, 391 F.2d 507, discussed in the Government's Brief, page 37, footnote 29, necessarily found insufficient an affidavit in which the affiant wholly failed to state the basis of the "information from a confidential informant that the electric blenders were . . . in the building" or the date as of which his "information" spoke. The affidavit rested, then, on a Special Agent's statement that he saw "a large number of boxes" bearing the brand name of the stolen blades through a window in a food store and warehouse complex.

March 13th after taking up the surveillance of the CBS warehouse, first to alert him to stand by ready to apply for a warrant and, later, after observing the arrival of the rented truck and vans and the commencement of the delivery to the defendants-appellants, to ask Colgan to proceed to obtain the warrant, but he could not say that he told Colgan what he had been observing at the CBS warehouse.

Special Agent Colgan's testimony at the hearing was the following:

Colgan was at the United States Attorney's office in the Eastern District at about 10:00 A.M. or 10:30 A.M. on March 13th when he received a telephone call asking him to stand by a telephone in connection with the continuing investigation of the Schick products highjacking, a matter with which he was already familiar. At around 11:45 to 12:30 A.M. Agents Pecoraro and Dowd telephoned him. Pecoraro told Colgan that his confidential source had told him the night before and that morning

"that this confidential source had unloaded a trailer-load of Schick Products that he knew had been stolen in New Jersey."

Pecoraro informed Colgan of the matter related to the informant's reliability. Colgan said that Pecoraro told him that

" . . . the confidential source supplied him with the information that he, the source, had helped unload the stolen Time D.C. trailer containing the Schick products on a day also before March 13th. This informant also advised that he helped load a number of rented trucks with the Schick Products, and that these rental trucks went to two separate Brooklyn warehouses.

" . . . that one warehouse was called S & F Warehouse and the other was CBS Warehouse, 50th Street and 1st Avenue in Brooklyn. Further, the informant advised that he had delivered on March 12th a shipment that did go to the CBS Warehouse, and also supplied one identifying number of Schick Products as 0240 as being in the cartons, a large number of the cartons delivered to CBS."

Agent Dowd, the case Agent, gave him background data on the case, and advised Colgan that he did not know that the number 0240 was particular to the stolen shipment. Colgan checked through the FBI office in New Haven and was advised that the number was definitely part of the shipment of Schick Products that had been highjacked in New Jersey.

On the basis of these data, Colgan signed the affidavit on which the warrant was granted. When he had the warrant, he went directly to CBS, a distance of three miles, arriving there about 4:00 P.M.

Colgan was the Special Agent who had been at CBS on February 4th in connection with the Whitehall Laboratories seizure, and he had that limited acquaintance with defendants Kahan and Mor Wercberger. The March 13th search at CBS under the warrant resulted in the seizure of the 5072 cartons of Schick products as well as in the production of the "documentation" relating to the deliveries of March 12th and 13th.

Colgan thought that the information in the affidavit was given to him before and did not relate to the delivery of March 13th, and that the informant had delivered part of the stolen shipment to CBS on March 12th and knew that another part of it had been delivered to S & F. Colgan did not hear anything to the contrary until about a week or ten days before the hearing. While he had spoken to Pecoraro and Dowd during the same telephone call at about midday on March 13th, he did not realize that they were on surveillance at CBS, nor did he learn that the March 13th delivery was under way and that the informant was participating in it. The Magistrate signed the warrant at about 3:30 P.M. or 3:45 P.M.; the evidence indicates that the March 13th delivery had been completed at that time.

Chief Judge Mishler denied the motion to suppress. He found that the affidavit was in error because of a misinterpretation of the informant's statement to Pecoraro. The error was considered unimportant because the informant's significant information was that he had the stolen load and

that it was going in part to S & F and in part to CBS. It was concluded that the credibility of the informer and of the information he furnished had been shown. Defendants argued that the fact that the Agents' misstatement was innocent would not validate the warrant because their error was due to culpable negligence (cf. *United States v. Gonzalez*, 2d Cir. 1973, 488 F.2d 833, 837–838), but the Court found that, under the pressure of time that Pecoraro testified to, he was not negligent but acted reasonably.

■ The record requires the conclusion that the misstatement was not intentional. Plainly, a correct statement either of Pollari's activities and observations on March 12th, including the arrangement for the delivery to CBS on March 13th, or of Pecoraro's and Dowd's observations on the 13th, or of both could not have weakened, but would have strengthened the affidavit; there was no occasion to misstate or conceal. The testimony of Colgan and Pecoraro reveals nothing that suggests any possible reason for making a misstatement, and contains nothing that would support an inference that they were not frank with the court. Rather, the contrary is established by the manner in which they testified to the times at which Pecoraro reported Pollari's statements to Colgan and at which Colgan learned that Pecoraro and Dowd had the March 13th delivery under surveillance from beginning to end. Neither *Gonzalez* nor *United States v. Pond*, 2d Cir. 1975, 523 F.2d 210, 213–214, can be read as intimating that materiality alone in a misstatement will invalidate a warrant absent negligence or, very likely, something going beyond simple negligence. See *United States v. Pond, supra*, 523 F.2d at 214 (" . . . we agree that the most that can be said . . . is that the agent made the statement 'negligently.' ")

The materiality of the statement must be examined from a second point of view. Ordinarily, if a material statement is wrong, the consequence is a material misstatement. But the disparity between the statement made and the perfectly true statement may be immaterial as Chief Judge Mishler found it to be in this case. That is, the statement was not materially wrong. The critical content of the statement was that part of the March 12th delivery went to S & F and part to CBS, and Pollari was a competent informant on the program that he was helping to execute.

2. Defendants contend that the court should have excluded the evidence of the dealings with the Whitehall goods. The argument is that it was not shown that the Whitehall goods were stolen, and, if that was shown, there was no evidence that defendants received the Whitehall goods knowing them to be stolen.

■■ The evidence was offered on the issue of defendants' knowledge that the Schick products were stolen property. The Government abundantly showed that the Whitehall products were stolen. *United States v. Leonard*, 2d Cir. 1975, 524 F.2d 1076, 1090–1091, has made it clear that the "similar act" relied on as evidence of intent need be proved only by a preponderance of the evidence. The Government bore its burden of proof when it showed that the Whitehall drugs were shipped to Whitehall's Texas warehouse from Connecticut and did not arrive, but were soon found in a Brooklyn warehouse under the shipping order copy of a bill of lading of an unnamed carrier consigned to "A. Perez" in Brazil, that the goods were taken by the FBI and returned to Whitehall, and that no one thereafter appeared, with or without the original "A. Perez" bill of lading, to demand the goods of CBS.

■ The Government did not have to show that the defendants knew when they received them that the Whitehall products were stolen. That has been settled in this district, so far as concerns a charge of receiving stolen goods knowing them to be stolen, since *United States v. Brand*, 2d Cir. 1935, 79 F.2d 605. See also *United States v. Baum*, 2d Cir. 1973, 482 F. 1325, 1330–1331; *United States v. Schaffer*, 2d Cir. 1959, 266 F.2d 435, 442; cf. *United States v. Seeman*, 2d Cir. 1940, 115 F.2d 371, 373; *United States v. Antrobus*, 3d Cir. 1951, 191 F.2d

969, 971. As *Leonard* pointed out, 524 F.2d at 1090–1091 (commenting on the contention that "similar acts" should be admitted only if proved by "plain, clear and conclusive" evidence):

> "This view appears to rest on a misconception. Similar act evidence is admitted to show wilfulness and for other purposes, not because it may indicate the commission of crime but in spite of that. . . . While 'the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged,' *In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368, . . . the 'fact' here is wilfulness, not each subsidiary fact offered to establish it."

The function of the Whitehall evidence was to persuade the jury that, if a person has twice within a short time received a large shipment of stolen goods under strikingly similar circumstances (that is, similar "documentation", receipt within a day or two of the highjacking, absence of any later demand for the goods by the supposed consignee, ignorance of the identity of the consignee) the supposition that the warehouseman did not know the goods were stolen is greatly weakened, and an inference of guilty knowledge is given strong support. As Judge Learned Hand said in *Brand* (79 F.2d at 606):

> " . . . the competence of such evidence does not depend upon conformity with any fixed conditions, such as upon direct proof of scienter, or the identity of the thief in the earlier instance, or of the victim, or the number of instances in which the accused received stolen goods, or the similarity of the goods stolen. These are all relevant circumstances but not necessary constituents. Nor can we see any basis for distinguishing between knowledge and intent in such cases. The judge must decide each time whether the other instance or instances form a basis for sound inference as to the guilty knowledge of the accused in the transaction under inquiry; that is all that can be said about the matter."

There was no error in the admission of the Whitehall evidence and the Court's instruction on it was more favorable to defendants than the law required it to be.

3. Appellants give great emphasis to the supposed error in admitting the testimony of an informer, Cogar, concerning declarations made by alleged co-conspirators after the defendants were arrested. The testimony, relevant to the conspiracy count, if admissible at all, was of the sort Judge Friendly commented on in *Leonard* (524 F.2d 1084):

> " . . . the prosecutor chose to imperil a good case by introducing a line of evidence that added little but was bound to be a prolific breeder of substantial claims of error . . . "

That the jury found the testimony valueless may well be the meaning of its verdict of not guilty on the conspiracy count.

Cogar, like Pollari, was an undercover informer from July 1974 until May 1975, working with federal agents other than those with whom Pollari was working. Neither Cogar nor Pollari knew that the other was an undercover informer. The theory on which the evidence was admitted was that the conspiracy embraced the receiving, possessing and paying for the Schick products, and not confessing or informing when arrested.

Cogar testified that he knew Jimmy Santa, Stanley Diamond and Manny Gomez and on occasion met them at the dress shop of his father-in-law, and that on March 14, 1975, the day after defendants' arrest, while Cogar was at work in the shop Santa, Diamond and two others were present; Santa was reading a newspaper and then passing the paper to Diamond and pointing to a news item, he asked, "What do you think of the rabbis?" To this, Cogar testified, Diamond answered, "Don't worry, don't worry, they're stand-up people." Cogar said that he later looked at the article Santa had pointed to: its headlines related to the Schick highjacking. Later the same day, Cogar testified, he was at Tommy Reel's house to play cards and Santa and Diamond

were also present. Diamond told him that the persons earlier referred to were not rabbis but Orthodox Jews [6] who wore black hats and beards; on the same occasion he heard Diamond tell Santa, referring to the "rabbis", "They're tough people, they won't get anything out of them." Cogar further testified that on March 19th at Tommy Reel's for a card game with Santa, his brother, Manny Gomez and Diamond, he heard Diamond ask Santa if he had got any more money and heard Santa answer that "he was going to see them, the rabbis, on Saturday about getting the rest of the money." After Santa left the room, Cogar said that Diamond told him that not the Italians, as people supposed, but the Jewish people have all the money, and that the money "that they had received was brand new one hundred dollar bills with the wrappers that had the Star of David on it." Cogar added that Diamond was referring to "the money that they had gotten from the rabbis." He said Diamond made other remarks, such as that the money was "buried and not in banks", that "the money could never be, you know, shown."

Cross-examination developed that in the period in question Cogar had become an informant to avoid prosecution for credit card fraud, was a paid informant, "earned" money unloading highjacked trucks and disposing of the goods with Santa, Diamond, and his father-in-law, but at the same time furnished information to the Government in all cases in which he helped with such unloading, and gathered intelligence information for the Government in the course of daily card games which the Government furnished him money to attend. Cogar testified that a few months before March 1975 he was addicted to heroin, but in March 1975 had become an occasional user of heroin, having started to use methadone "to come down."

Near the commencement of Cogar's testimony, the Court instructed the jury that it could not consider the conversations between Santa and Diamond made after defendants' arrest as evidence against defendants if they concluded that upon arrest defendants were no longer members of the conspiracy, and could consider the conversations as evidence against them only if they found that the defendants had become members of the conspiracy, that Diamond and Santa were members of the conspiracy and that the conspiracy continued through the dates of the conversations. In the final instructions to the jury the Court, after the general charge on conspiracy, explained the defense contention: that the accused, if shown to have been conspirators, were not such after their arrest; emphasized that Diamond's statements could be considered only if the jury found as facts that the defendants and Diamond were members of the conspiracy; and that the Diamond declarations were made to advance the purposes of the conspiracy, and that the declarations were made when the defendants were still members of the conspiracy. The instructions continued:

"But, whether or not the defendants were members of the conspiracy or continued to be after their arrest, are fact questions for the jury. You take into consideration the purpose and object of the conspiracy, and you determine whether this was really a sale of the goods as the government contends and if it was the sale of the goods, whether payment for the goods was part of the purpose of the conspiracy, and whether they still were part of the conspiracy for those purposes. But, again I say, that is a fact question. If you find against the government on the issue and in favor of the defendants, that after the arrest the defendant could not have been part of the conspiracy, then whatever Diamond said even if he were a member of the conspiracy, cannot be charged against them, no longer an act, no longer a part of it. Of course, I caution you that you must also find from the evidence that Diamond was a member of the conspiracy. If he was not a member of the conspiracy then, of course, what he said cannot in any event be charged to these defendants."

6. The evidence was that defendants were Orthodox Jews of a very strict sect.

Appellants argue first that the indictment did not charge a conspiracy that extended to appellants' buying and paying for the Schick products and that, in the common case, a sale of stolen goods to one who knows they are stolen is not, without more, a conspiracy. However, an indictment need not allege every circumstance of a conspiracy so long as it unmistakably identifies the conspiracy charged. *Wong Tai v. United States*, 1927, 273 U.S. 77, 80–81, 47 S.Ct. 300, 71 L.Ed. 545. Here, moreover, the third overt act alleged in the indictment was the second of the Diamond conversations, though it is dated March 14th. The indictment thus disclosed the particular circumstance, but it charged conspiracy to receive and possess without adding conspiracy to buy. There was neither variance nor surprise in presenting in support of the conspiracy to receive and possess evidence that the conspiracy embraced the further circumstance of payment, an obvious and expectable element although not charged as the gist of the conspiracy. See *United States v. Fischetti*, 5th Cir. 1971, 450 F.2d 34, 40; *Danielson v. United States*, 9th Cir. 1963, 321 F.2d 441, 443; *Medrano v. United States*, 9th Cir. 1961, 285 F.2d 23, 26.

The case is not one in which a simple sale of goods known to be stolen is charged as a conspiracy between seller and buyer, as in *United States v. Zeuli*, 2d Cir. 1943, 137 F.2d 845, which itself recognized that the "doctrine" is confined to the instance where the indictment charges or the proof shows no more than the sale transaction. More was charged here, and the evidence presented to the jury was not simply evidence of knowing receipt of stolen property. At the very threshold of the matter the appellants concerted their activities, innocent or guilty, in receiving and possessing the allegedly stolen property. Beyond that there was evidence that at least as early as 11:30 P.M. on March 11th, the night of the highjacking, a "buyer"—not necessarily appellants—had expressed satisfaction with the stolen property; appellants accepted the March 12th delivery, accepted the International Trading Company shipping order copy of the bill of lading, set up the internal inventory documentation, prepared in part the invoice to the "International Trading Company", received the second delivery from the same highjacking, and put into operation, when interrogated, the scheme of internal documentation keyed to the shipping order furnished by Santa and, it may be inferred, delivered by the De Fillippo brothers. See *United States v. Mayes*, 6th Cir. 1975, 512 F.2d 637, 647–648; *United States v. Cook*, 5th Cir. 1972, 461 F.2d 906, 910 (footnote 3); *United States v. Jackson*, 6th Cir. 1970, 422 F.2d 975, 977–978; *cf. United States v. Untiedt*, 8th Cir. 1974, 493 F.2d 1056, 1058–1059.

The argument that there was no evidence of appellants' complicity in a conspiracy to buy authorizing the court to admit evidence of the declaration bearing on payment (*cf. United States v. Geaney*, 2d Cir. 1969, 417 F.2d 1116, 1120) is without substance. The evidence just referred to made out appellants' complicity in the conspiracy by a fair preponderance of the evidence.

It is too easy to argue that the conspiracy was at an end when the object of the conspiracy as charged was realized in appellants' receipt and possession of the stolen property; the conspiracy that existed in fact, and which included the receipt and possession charged in Count One, the jury could find, embraced payment as its last term, and implied the need to identify the ones who were to pay. The evidence of Cogar, if believed, functioned to identify appellants as the persons Santa referred to as "the rabbis" connected with the highjacked Schick products, and to present Santa's statement that he was going to get from appellants "the *rest* of the money". The most obvious, although not the necessary, interpretation of the verdict of not guilty on the conspiracy count may well be that the jury did not believe Cogar. But the Court was not free to rule as a matter of law that the conspiracy did not include payment by appellants as a term (*cf. United States v. Jackson, supra*) or to rule that the conspiracy ended with the seizure and arrests. *United States v. Borelli*, 2d Cir., 336 F.2d 376, 389–390; *United States v.*

*Franzese,* 2d Cir. 1968, 392 F.2d 954, 964; *United States v. Harris,* 7th Cir. 1976, 542 F.2d 1283, 1300–1301; *cf. United States v. Fischetti,* 5th Cir. 1971, 450 F.2d 34, 41; *United States v. Annunziato,* 2d Cir. 1961, 293 F.2d 373, 376–378. There was before the court, when the case went to the jury, not only Cogar's testimony, but the whole sequence of events including appellants' insistence to the FBI Agents that the Schick products were innocently warehoused under documents, however dubious, which they produced, and Pollari's testimony that Santa paid him and the De Fillippos the sum of $700.00 each on March 13th, after the seizure. There was no question of Santa's complicity in the conspiracy, and the Diamond declarations derived their significance only as they identified appellants as the persons with whom Santa was continuing to deal in connection with his disposition of the highjacked Schick products. That Diamond himself was a conspirator, the jury could find, followed from his participation in the conversation with Santa to which Cogar testified; he was not in those conversations a mere observer. It was not error for the court to rule, in ultimate substance, that the jury could find from the evidence, if they accepted it as truthful, that the declaration about obtaining payment from appellants, identified through the Diamond declarations, could be found to be in furtherance of the conspiracy, and that the conspiracy could be found to extend beyond the seizure and arrest and until the time when the March 14 conversation took place.

It is not necessary to consider whether the evidence was independently admissible on the substantive count, although it would appear no less admissible on the issue of knowledge (*cf. United States v. Wilson,* 7th Cir. 1974, 506 F.2d 1252, 1257), nor to consider whether, if it should not have been admitted, it was so prejudicial as to require reversal of the convictions. *Cf. United States v. Floyd,* 2d Cir. 1977, 555 F.2d 45; *United States v. Stanchich,* 2d Cir. 1977, 550 F.2d 1294, 1298–1300.

Judgments affirmed.