The UNITED STATES of America

v.

Odell BROWARD, Gary L. Forbes.

No. CR–76–33.

United States District Court,
W. D. New York.

Oct. 25, 1978.

Richard J. Arcara, U. S. Atty., Buffalo, N. Y. (Theodore J. Burns, Asst. U. S. Atty., Buffalo, N. Y., of counsel), for plaintiff.

Vincent E. Doyle, Jr., Buffalo, N. Y., for defendant Broward.

Arthur F. Dobson, Jr., Buffalo, N. Y., for defendant Forbes.

MEMORANDUM and ORDER

ELFVIN, District Judge.

The abovenamed defendants were indicted March 4, 1976 in a five-count indictment charging both with having conspired earlier in 1976 to distribute heroin and charging defendant Forbes in four counts of having distributed heroin or possessed heroin. As to one of said distribution counts, defendant Broward is charged with having aided and abetted defendant Forbes.

The case had its genesis in Detroit where one Margaret Carriger had been and was acting as an informant for the Federal Bureau of Investigation ("FBI") and particularly for Special Agent Randolph G. Prillman. She had been acquainted with Broward who had convinced her to assist him in a narcotics deal. In that connection she was to and did meet Broward in Toronto February 13, 1976 at a specified hotel. Prillman alerted the Ontario (Canada) Provincial Police ("OPP") and, prior to leaving Detroit, she met and talked with an officer of the OPP. Prillman made no contact with the United States Drug Enforcement Administration ("DEA") because the transaction was supposed to take place in Canada. Carriger was most desirous of having her role and status with the FBI kept confidential because, among other things, she was afraid of Broward. The OPP had relayed the information to the Royal Canadian Mounted Police ("RCMP") which had the

prime responsibility for drug investigations in Canada. It was decided to seek authorization for surveillance of the telephone conversations to and from Broward's room in the Toronto hotel and an emergency authorization good for 36 hours was obtained. Later a regular authorization was received. The Canadian police secured an "observation room" at the hotel. The OPP, by way of "courtesy", advised Prillman that Carriger had met with Broward and others in Toronto and that there had been some talk about a narcotics transaction. Broward wanted Carriger to act as a courier for the distribution of heroin but Prillman and the Canadian police decided that the enterprise occasioned too much risk for the informant and it was agreed that she should be extricated. While the transaction had at the outset been evaluated as a wholly Canadian operation, the DEA's resident agent (Gill) in Toronto was apprised of the investigation when information concerning Broward was needed and Gill was thereafter at a time or times physically present in the observation room. The DEA cooperated with the RCMP by supplying photographs of Broward. DEA Special Agent "AAA"[1], stationed in Buffalo, was telephoned by Gill and it was AAA who physically carried Broward's photographs and record to St. Catherines which Canadian city is roughly halfway between Toronto and Buffalo and handed them over to Gill. Gill also had asked AAA to inquire concerning any airplane reservations to Toronto in Broward's name and AAA gave information concerning the same to Gill. As a result of the travel data and photographs, the Canadian law enforcement officers were able to recognize Broward at the Toronto airport and to initiate their surveillance of him.

Broward wanted Carriger's help in carrying heroin from Buffalo to Detroit and Los Angeles and threatened that he would find her wherever she went if anything went wrong. Carriger feared for her life and tried to beg off by telling Broward that her contacts were interested only in cocaine and not in heroin; however, Broward insisted that anyone who bought or used cocaine would buy or use heroin. The Canadian police, from time to time and surreptitiously, were able to confer with Carriger. It developed that a heroin deal was to "go down" in the United States, that there was a cache of heroin in Buffalo and that she was to have a transaction in heroin with Forbes in Buffalo. Consequently, the Canadian police obtained permission from Prillman for Carriger to work with the DEA on the matter and deferred to the DEA; no criminal charges were laid in Canada. Broward had telephoned Forbes's home in Buffalo from Toronto and a meeting of Broward and Forbes and Carriger was arranged for Buffalo. The DEA had joined in persuading Prillman to release Carriger for work with it and promised to assure her safety. Arrangements were made to institute and maintain a surveillance of Broward and Carriger when they reached Buffalo. Only Carriger came to Buffalo, she was met by Forbes and taken to a Buffalo hotel where her room was kept under surveillance from the time she checked in. An attempt was made to tail Forbes as he left but he employed evasive tactics and the surveillance could not be maintained. Special Agent Peterson of the DEA had registered into the room next to Carriger's and he had had voice contact with Carriger who had reported that Forbes was to return soon. Forbes did return and remained for some 45 minutes in Carriger's hotel room and, as soon as he was reported to have left the area of the hotel, Peterson went to Carriger's room; Carriger had told Peterson by telephone that she had received $5,000 worth of heroin from Forbes and that it was strapped to her body in plastic bags. Carriger was relieved of the heroin and travelled at once to Detroit and Prillman.

AAA had been on leave and had been summoned back to Buffalo to assist in the Buffalo events. He and his superior and an

---

1. I intend not to display the individual agent's name in this opinion and will similarly treat the identity of a certain police officer.

attorney from the office of the United States Attorney conferred and decided that Margaret Carriger should be charged as a defendant because her life or physical well-being had been threatened and such charges would tend to "cover up" her informant status. The attorney approved the affidavit and complaint and AAA took them to the home of the United States magistrate Edmund F. Maxwell, he being out of his office on the legal holiday. With Buffalo Police Department Detective BBB [2] present, AAA (according to his and BBB's later testimony) advised the magistrate of the threats to Carriger and told him that she was a government informant, that she was identified in the documents as "Margaret Carcer" in order to aid in the coverup of her assistance to the governments of Canada and the United States and that a fictitious unnamed informant had been introduced to the narrative. The pertinent parts of AAA's supporting affidavit are as follows:

" * * * On February 12, 1976, your deponent received information from Special Agent Frank Gill, Toronto DO, that Odell BROWARD would be traveling to Toronto, Ontario, Canada to meet with Margaret CARCER, and other unknown individuals to negotiate for the sale of a large quantity of heroin. On that date your deponent did verify that BROWARD travelled to Toronto via Allegheny Airlines.

"On February 13, 1976, Margaret CARCER arrived in Toronto, Ontario, from Detroit, Michigan.

"On February 13, 14, and 15, 1976, CARCER, BROWARD, and two other unidentified individuals met in CARCER'S room in [a hotel] in downtown Toronto. The RCMP told your deponent that during the course of these meetings, BROWARD told CARCER that she was to travel to Buffalo, New York and pick up a sample package. CARCER told BROWARD that she had customers in Detroit and California.

"The RCMP told your deponent that on February 14, 1976, BROWARD contacted Gary FORBES in Buffalo, New York, and directed him to prepare a special sample for one. BROWARD further told FORBES that CARCER was negotiating for at least a hundred thousand dollars worth, and a special package of "pure" and a five thousand dollar package was needed for the customers in Detroit. Broward told FORBES that CARCER would be arriving in Buffalo, New York, on February 15, 1976 via Allegheny Flight # 804, which would arrive in Buffalo at about 1:59 PM and that he (FORBES) should pick up CARCER at the airport. BROWARD directed FORBES to rent a room at [a certain hotel in] Buffalo, New York, and that the transaction would take place there.

"Special Agent Kenneth B. Peterson told your deponent that on February 15, 1976, at about 1:55 PM, CARCER arrived at the Buffalo International Airport and was met by FORBES. FORBES AND CARCER were followed by agents of the Buffalo District Office, DEA, to the [hotel].

"At about 2:35 PM, Agent Peterson observed FORBES exit the [hotel], enter his vehicle and drive in a circuitous manner to the vicinity of Tupper and Franklin sts, Buffalo, where the surveillance was discontinued due to his extremely evasive driving techniques.

"Your deponent was advised by Special Agent Peterson that CARCER had registered in Room 414 in the [hotel].

"At about 4:15 PM, Forbes was observed arriving at the [hotel] carrying a dark colored briefcase, and enter CARCER'S room. At about 5:20 PM, FORBES left the [hotel] and drove in an evasive and circuitous manner to the parking lot of Audrey and Dell's Records, Walnut and Broadway, where he parked his vehicle and was observed entering 362 Broadway.

"On February 16, 1976, your deponent was advised by Special Agent Randy Pillman [sic], FBI, Detroit Office, that a reliable informant stated that he had seen Margaret CARCER on the evening

2. See note 1, *supra*.

of February 15, 1976, in Detroit, Michigan. This reliable informant told Agent Pillman that he had seen brown powder contained in two separate glassine envelopes and an additional two clear plastic bags containing brown powder, all taped to CARCER's body with brown tape. This informant told Agent Pillman that CARCER had stated that she had met and negotiated with Odell BROWARD in Toronto, Ontario, and had subsequently, on February 15, 1976, travelled to Buffalo, N.Y. at his (BROWARD's) direction and met with and obtained the heroin which was taped to her body from Gary FORBES.

"The above reliable informant is considered reliable based on the following;
  information furnished by the informant to Agent Pillman has resulted in two active investigations by the FBI into program frauds in the Detroit area, and six active investigations into illegal gambling, extortion and prostitution in Detroit, Michigan and Los Angeles, California. * * * "

Arrest warrants were obtained for all three. A complaint issued against Broward and Forbes and "Carcer" for having violated the drug laws of the United States (the particular criminal event being a transfer of a certain amount of heroin from Forbes to "Carcer" at the Buffalo hotel). Forbes was arrested in front of an apartment building and, when Forbes indicated that he wanted personally to tell his wife of this happening, he was escorted by DEA agents to his apartment. The agents from the apartment doorway saw marihuana and hashish and a pipe. AAA and two other agents entered the apartment with Forbes. AAA telephoned the office of the United States Attorney and then departed with officer BBB of the Buffalo Police Department to procure the search warrant now sought to be quashed. The execution of the search warrant had produced various items of drugs and drug-cutting and packaging equipment which is sought to be suppressed as evidence. The search warrant's legal viability and the admissibility of the seized items thus are "bootstrapped" to the legality of the arrest warrant.

AAA testified under oath in court that he and his brother agents were, at the time he and BBB went to the magistrate's home to swear out the complaint and secure the arrest warrants, concerned about Carriger's safety even though she had departed from Buffalo and had reached Detroit and the FBI agent whose informant she was. There had been threats made against her by Broward and AAA testified that the existence of these threats and the risk to Carriger's well-being were fully explained to the magistrate who had questioned AAA concerning both. AAA testified that he had advised the magistrate that a false name and fictitious informant were being employed in the affidavit and in the complaint and arrest warrants and that the magistrate had thereafter allowed the use of the false name. BBB testified that the mechanism of protecting Carriger by naming her as a co-defendant but with a false name was discussed with and cleared by the United States Attorney's office, that he had gone with AAA to the magistrate's home, that the magistrate had questioned AAA and BBB for about one hour, that the magistrate was advised of the danger to Carriger and of her being referred to as Carcer. The magistrate, AAA and BBB testified, was told the true facts and that Carcer was a false name and that there was no additional informant despite the specific statement in the affidavit that "a reliable informant" had told the FBI in Detroit that he had seen Margaret Carcer in Detroit with plastic bags containing a brown powder taped to her body. After such testimony before me by AAA and BBB, the magistrate himself was called to the witness stand and related that, while he had no independent recollection of the events attending the issuance of the arrest warrants, there had been at some time conversations about the female defendant but that he would not have signed the complaint if he had known that the affidavit was not true. He was questioned closely by the court and insisted that he never would issue a warrant upon known misrepresentations.

Counsel for the Government has placed reliance on the March 7, 1978 decision of the United States Court of Appeals for the Second Circuit in *United States v. Kahan,* 572 F.2d 923, *cert. denied,* —— U.S. ——, 99 S.Ct. 112, 58 L.Ed.2d 128 (1978), wherein the effect of a mis-statement in an affidavit for a search warrant was considered. *Id.,* pp. 930–32. That matter came to the appellate court after the trial judge had denied a motion to suppress the evidence seized pursuant to the search warrant and the defendants had been convicted upon ample supporting evidence of charges of having received goods which had been stolen from interstate commerce and which defendants knew to have been stolen. An interstate shipment had been hijacked and an informant for the FBI had been enlisted by the defendants to help to transfer the goods into warehouses. On a certain day, the informant said, part of the goods had been moved into two particular warehouses, one of which later was the subject of the search warrant; the agent misconstrued such information, thinking and stating that the informant had been in the later-searched warehouse.[3] The trial judge had found the disparity between the erroneous material statement (that the informant had been inside the warehouse on the first day) and the true statement (that the informant had delivered part of the goods on that day to another warehouse while others had delivered another portion to the warehouse in question) to be immaterial. The statement in the affidavit was, he held, not materially wrong and the appellate court affirmed. There was no consideration whether the magistrate would not have issued the search warrant if he had been told the truth or, importantly to my consideration, whether he would not have issued the search warrant had he been informed that the statement in the affidavit that the informant had actually been at the warehouse to be searched was false and that the truth was that the informant had been at a different warehouse and only had been told

that others were taking goods to the later-searched warehouse. As the foregoing demonstrates, it is difficult to bring the *Kahan* decision to a point of any applicability to the instant facts. Here an agent of the government purposely misrepresented facts to the magistrate and the magistrate would not have issued the search warrant if he had known that the representation was not true.

The government has invited my attention to the June 26, 1978 opinion of the United States Supreme Court in *Franks v. Delaware,* —— U.S. ——, 98 S.Ct. 2674, 57 L.Ed.2d 667. Therein the holding of the Supreme Court of Delaware that no attack upon the veracity of a search warrant could be made was reversed and remanded for further consideration. The falsity in the affidavit made to the magistrate was claimed to be that the affiant had stated that certain material information had been related to him by a specified lay person whereas, in fact, such person never had talked with the affiant but may have given "somewhat different" information to another police officer. The highest court stated the following (*Id.,* at pp. 2681–82):

"In deciding today that, in certain circumstances, a challenge to a warrant's veracity must be permitted, we derive our ground from language of the Warrant Clause itself, which surely takes the affiant's good faith as its premise: '[N]o warrants shall issue, but upon probable cause, supported by Oath or affirmation . . . .' Judge Frankel, in *United States v. Halsey,* 257 F.Supp. 1002, 1005 (S.D.N.Y.1966), aff'd, Docket No. 31369 (CA2 1967) (unreported), put the matter simply: '[W]hen the Fourth Amendment demands a factual showing sufficient to comprise "probable cause," the obvious assumption is that there will be a *truthful* showing' (emphasis in original). This does not mean 'truthful' in the sense that every fact recited in the warrant affidavit is necessarily correct, for probable

---

**3.** By the time of the actual issuance of the search warrant on the following day, the informant actually had been in the warehouse in question and had participated in unloading there a further portion of the hijacked goods.

cause may be founded upon hearsay and upon information received from informants, as well as upon information within the affiant's own knowledge that sometimes must be garnered hastily. But surely it is to be 'truthful' in the sense that the information put forth is believed or appropriately accepted by the affiant as true. It is established law, *see Nathanson v. United States,* 290 U.S. 41, 47, 54 S.Ct. 11, 13, 78 L.Ed. 159 (1933); *Giordenello v. United States,* 357 U.S. 480, 485–486, 78 S.Ct. 1245, 1249–1250, 2 L.Ed.2d 1503 (1958); *Aguilar v. Texas,* 378 U.S. 108, 114–115, 84 S.Ct. 1509, 1513–1514, 12 L.Ed.2d 723 (1964), that a warrant affidavit must set forth particular facts and circumstances underlying the existence of probable cause, so as to allow the magistrate to make an independent evaluation of the matter. If an informant's tip is the source of information, the affidavit must recite 'some of the underlying circumstances from which the informant concluded' that relevant evidence might be discovered, and 'some of the underlying circumstances from which the officer concluded that the informant, whose identity need not be disclosed, . . . was "credible" or his information "reliable." ' *Id.,* at 114, 84 S.Ct., at 1514. Because it is the magistrate who must determine independently whether there is probable cause, *Johnson v. United States,* 333 U.S. 10, 13–14, 68 S.Ct. 367, 368–369, 92 L.Ed. 436 (1948); *Jones v. United States,* 362 U.S. 257, 270–271, 80 S.Ct. 725, 735–736, 4 L.Ed.2d 697 (1960), it would be an unthinkable imposition upon his authority if a warrant affidavit, revealed after the fact to contain a deliberately or reckless false statement, were to stand beyond impeachment."

Deliberate falsity or reckless disregard of the truth by the affiant can, the Supreme Court held, be attacked and such would negate the authority of the search warrant unless, absent the false statements, there remained probable cause to support the issuance of the warrant. Mere negligence on the part of the police in checking or recording the facts relevant to a probable cause

determination would not be sufficient to set aside the magistrate's determination. AAA's affidavit in the instant case has to be gauged as deliberate falsity and he admitted in his testimony in court that such was the fact. He deliberately and purposely named Margaret Carriger as Margaret Carcer and created for the magistrate the image of an informant known by him not to exist. AAA narrated in his affidavit that the FBI agent Prillman had told him that a reliable informant had stated that he had seen Carcer in Detroit at a time later than Forbes had been seen to have had personal contact with Carcer in Buffalo, that said informant had seen Carcer with glassine envelopes and clear plastic bags containing a brown powder taped to her body and that Carcer had told the informant that she had met and negotiated with Broward in Toronto and had travelled at Broward's direction to Buffalo where she had met Forbes and had obtained from him the heroin which was strapped to her body. The fantasy was embroidered upon by assertions as to the reliability of this non-existent informant. In fact, and as AAA well knew, another agent of the DEA had obtained the heroin from Carriger in Buffalo after Forbes had delivered the same to her and Carriger had then gone on to Detroit sans heroin. Absent some statement evidencing delivery of the drugs by Forbes to Carriger, the existence of probable cause for the issuance of the arrest warrant becomes problematic and conjectural (although theoretically the crime of a conspiracy to violate the drug laws of the United States could be spelled out together with one or more overt acts, unnecessary though any such overt acts may be to a violation of 21 U.S.C. § 846).

The evidentiary proceeds of the execution of the search warrant must be and hereby are ORDERED suppressed.

While such might be the limit of any sanction or penalty to be leveled against the government for what happened before the magistrate, much more must be done to this prosecutory endeavor due to the testimony given by the agent and the detective in the courtroom while under oath. Both told me

that AAA had known the affidavit to have been false, that he had told the magistrate that it was false and in what regard it was false and that the magistrate thereupon had issued the search warrant upon the false affidavit. The magistrate was so definite and clear in his testimony under oath in the same courtroom at a later date that not only was he not advised that the affidavit was false in regard to Carriger's identity and doings but he would not then or at any other time past or future issue a search warrant in such circumstances. I am directed by the above to but one conclusion and that is that the agent and the police officer knowingly gave false testimony under oath in a courtroom of the United States in an important portion of the proceeding in this case.[4]

As was stated in *United States v. McCord,* 166 U.S.App.D.C. 1, 509 F.2d 334 (1974), *cert. denied sub nom. McCord, a/k/a Warren et al. v. United States,* 421 U.S. 930, 95 S.Ct. 1656, 44 L.Ed.2d 87 (1975), "serious prosecutional misconduct may so pollute a criminal prosecution as to require dismissal of the indictment or a new trial, without regard to prejudice to the accused" and "courts have ordered new trials when the prosecution has knowingly used perjured testimony". (509 F.2d, at 349). In *United States v. Heath,* 260 F.2d 623 (9th Cir. 1958), the trial court's dismissal of the indictment because the government did not produce before trial certain documents which were deemed necessary to the defense was upheld. The documents were claimed to have been obtained from defendant by agents of the Internal Revenue Service and not returned. Defendant was not able to show any receipt for the documents but the court concluded after a hearing that they had been turned over to the agents but had been lost and could not be produced. The government claimed that it never had received the particular documents. The court directed that a motion to dismiss be filed; the motion, which stated no ground for dismissal, was filed and granted. It was held "that a federal judge is not a mere automaton steering a course or deflected therefrom by mechanical or electronic devices" but that "his office is judicial and requires the exercise of discretion in extremely delicate situations." *Id.,* at 625–26. The government's argument on appeal that it should not matter by whose hand or fault the documents were lost was "emphatically rejected", the court holding that "agents of the government should not act an ignoble part." (*Id.,* at 629.) I find the actions of AAA and BBB in coming openly and boldly into a criminal proceeding and there blatantly relating material false testimony at least as ignoble an action as was faced in *Heath.* While there was in *Heath* the consideration of the alleged inability of the defendant to meet the charges without the documents, such inability is not a *sine qua non* to the end there achieved. I find sufficient basis for the dismissal hereby ordered by me in the need to impose sanctions for the gross misbehavior exhibited in a federal courtroom by this federal agent and this police officer. I could protect defendants merely by suppressing all evidence resulting from the arrest of Forbes and the subsequent inspection and searching of his apartment; such would, however, merely say to these and other governmental agents that they suffer only a mild if any reproach and detriment to their prosecution by resorting to ignoble action. To suppress such evidence and allow the prosecution to proceed to trial would be, in my judgment, comparable to allowing a thief who upon apprehension yields up the stolen goods to go free. As was cogently noted in *Franks v. Delaware, supra,* 98 S.Ct. at p. 2683:

> "The requirement that a warrant not issue 'but upon probable cause, supported by Oath or affirmation,' would be reduced to a nullity if a police officer was able to use deliberately falsified allegations to demonstrate probable cause, and, having misled the magistrate, then was able to remain confident that the ploy was worthwhile."

---

4. I have not approached this conclusion via any inquiry whether a reasonable person would or could have a reasonable doubt as to the agent's or the officer's liability for perjury.

The law expects that sanctions and punishments will be imposed for wrongdoing regardless of whether someone has been damaged thereby. Admittedly, exclusion was thought in *Elkins v. United States,* 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960), to be the only effectively available way to compel respect for the constitutional guaranty against unreasonable searches and seizures by removing the incentive to disregard it. (*Id.,* at 217, 80 S.Ct. 1437.) I construe *Elkins* as holding that exclusion as a minimum is required in the circumstance and not as forbidding a trial judge in his considered exercise of discretion to do more. The "imperative of judicial integrity" (*Id.,* at 222, 80 S.Ct. 1437) requires suppression of the evidence seized herein and amply justifies the heavy sanction of dismissal which I here impose upon and because of the in-court perjurious testimony of these two officers of the law.

It hereby is ordered that the within Indictment is dismissed.