**UNITED STATES of America,**

v.

**Hilda GARCIA, et al., sub nom., Louis Rupert Garcia, Defendants.**

**No. SSSS 84 Cr. 664 (MJL).**

United States District Court,
S.D. New York.

Feb. 6, 1986.

Rudolph Guiliani, U.S. Atty., S.D.N.Y., New York City, by Robert Garcia, Maria T. Galeno, Asst. U.S. Attys., for the U.S.

Michael M. Maloney, New York City, for defendants.

## MEMORANDUM OPINION AND ORDER

LOWE, District Judge.

Defendant Hilda Garcia moves to exclude evidence which federal agents seized when they arrested her and searched her home on the morning of September 6, 1984. The defendant claims that (1) there was no probable cause for the issuance of the search warrant; and (2) the issuing judge was misled by recklessly false statements made in the supporting affidavit for the search warrant.

## BACKGROUND

The government accuses defendant Hilda Garcia of receiving drugs as a member of a "wide-ranging" but "loosely structured" narcotics trafficking ring dealing primarily in heroin and cocaine and operating in Little Italy and the Lower East Side of Manhattan. (*See* Affidavit of Drug Enforcement Administration Special Agent Emilio Garcia dated December 5, 1984, hereinafter "Rider A," pp. 3–4). Count One of the indictment [1] charges Hilda Garcia, along with 13 others, with conspiracy to violate the federal narcotics laws under 21 U.S.C. §§ 812, 841(a)(1) and 841(b)(1)(A). Counts Three through Five charge that all 14 defendants possessed, with intent to distribute, various amounts of cocaine and heroin seized from two Manhattan apartments occupied by Louis Rupert Garcia and Awilda Nieves, co-defendants in this case. Count Nine charges Hilda Garcia with possession with intent to distribute 20.1 grams of cocaine and dilutents. The remaining three counts of the indictment do not relate to this defendant.

The indictment resulted from a lengthy investigation which included physical surveillance, undercover work, court-authorized wiretaps on telephones at three different locations over a three month period.[2] Additional evidence was recovered from searches conducted in 20 locations throughout the Southern District of New York.

The searches performed in the Southern District were executed pursuant to warrants issued on September 5, 1984 by Judge Cannella of this Court. Judge Cannella found probable cause to authorize the searches on the basis of the facts contained in Rider A.

The search of defendant Hilda Garcia's residence resulted in the recovery of "[t]wenty grams of cocaine and cut and assorted narcotics paraphernalia, including lactose and a triple-beam scale." (Government's Supplemental Memorandum Of Law In Opposition To Defendants' June 28 Motions, hereinafter "Government's Supplemental Memo # 1," p. 11).

## DISCUSSION

The defendant's suppression motion presents this Court with two central questions:

1. Did the information presented in Rider A state sufficient probable cause to support the issuance of the war-

---

1. The indictment described is the current superceding indictment, designated "SSSS" ("4S") in which defendant Louis Rupert Garcia (a/k/a "Papo") is the lead defendant. The original indictment in this case was filed on September 13, 1984. That indictment charged this defendant and 29 others with conspiracy to violate federal narcotics laws and included numerous substantive narcotics and firearms counts.

On January 8, 1986, the government filed the current 4S indictment and another indictment labelled "SSSSS" ("5S"), naming John Lewis DeLutro as its lead defendant. The 4S and 5S indictments apparently split what was initially characterized as one narcotics conspiracy into two. All previous motion practice has been incorporated into the new indictment. (Transcript dated January 16, 1986, p. 7).

2. Though telephones located at the residences of Louis Rupert Garcia and John DeLutro, as well as the telephone at DeLutro's business, were tapped pursuant to Court order, the intercepted communications involving Hilda Garcia all resulted from the surveillance of Louis Rupert Garcia's telephone.

rant to search Hilda Garcia's home?; and

2. If probable cause did not exist at the time the warrant was authorized, is exclusion of the seized evidence the appropriate remedy?[3]

Because we find that the information presented to Judge Cannella provides probable cause to support the issuance of the search warrant, we need not reach the issue of good faith.

The warrant which empowered federal agents to search Hilda Garcia's residence was based upon the facts presented in Rider A, the sworn affidavit of Agent Emilio Garcia. Those facts consisted of (1) excerpts or paraphrased accounts of two taped, intercepted communications obtained pursuant to Court authorized electronic surveillance over Louis Rupert Garcia's telephone; (2) Agent Garcia's summary conclusion, based on other intercepted conversations, that "HILDA GARCIA ... receive[s] narcotics from PAPO." (Emphasis in original).

### 1. The July 27 call

Paragraph 28 of Rider A states:

On July 26, 1984 [4], at 5:43 p.m., HILDA GARCIA called PAPO and asked him, "How much are nine shirts?" PAPO said he had to talk to her in person.

The defendant contends that the voice identified as Hilda Garcia's was not in fact her voice. (12/3 Tr., p. 48).

After listening repeatedly to the tape of the July 27 call (designated number 1389) and comparing it with five other tapes of Hilda Garcia's voice (calls 301, 401, 558, 1409, and 1859 on Louis Rupert Garcia's telephone), this Court finds that the voice on the July 27 call cannot be identified as Hilda Garcia's voice. (12/3 Tr., pp. 62–69; Transcript dated December 16, 1985, hereinafter "12/16 Tr.", pp. 24–25; Transcript dated December 18, 1985, hereinafter "12/18 Tr.", pp. 2–4). The entire taped conversation consisted of one short question asked in Spanish by the person alleged to be Hilda Garcia and seven additional words, uttered in fragments in both Spanish and English. The question, translated into English, reads "How much do the nine—nine shirts cost?" The other words on the tape which are alleged to be spoken by this defendant are: "Hello. Papo. Yeah. Mira. Ah. Nueve, nueve." In addition, there is no dispute that the voice on the tape is masked, either by drugs or alcohol.[5]

The defendant has made no showing that the attribution of the voice of the July 27 tape to Hilda Garcia was done with reckless disregard for the truth. See generally Franks v. Delaware, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). For purposes of deciding this suppression motion we will

---

3. By establishing the good faith exception to the exclusionary rule in United States v. Leon, 468 U.S. 897, 104 S.Ct. 3405, 82 S.Ct. 3405 (1984), the Supreme Court did not preclude initial inquiry into the question of probable cause for the issuance of a search warrant. Concerned that the exception could freeze the development of Fourth Amendment law, the Court specifically provided that:

There is no need for courts to adopt the inflexible practice of always deciding whether the officers' conduct manifested objective good faith before turning to the question whether the Fourth Amendment has been violated ... If the resolution of a particular Fourth Amendment question is necessary to guide future action by law enforcement officers and magistrates, nothing will prevent reviewing courts from deciding that question before turning to the good faith issue.

Leon, 104 S.C. at 3422.

4. Rider A incorrectly stated that the call occurred on July 26, 1984. The log report indicates that the call actually took place on July 27. (Transcript dated December 3, 1985, hereinafter "12/3 Tr.," p. 51).

5. Several of the tapes submitted by the government for comparison with the July 27 call contained a voice which the government contended was a masked version of Hilda Garcia's voice. The defendant conceded that the voice on each of those comparison tapes was her voice. However, either the conversations were too short to provide a valid comparison, or the voices on those tapes were dissimilar to the voice on the July 27 tape. (12/16 Tr., pp. 24–25; 12/18 Tr., pp. 2–4).

assume that the July 27 conversation could not be properly included as a basis of probable cause to issue the warrant.

### 2. The August 9 Call

Paragraph 33 of Rider A states:
On August 9, 1984, at 6:53 p.m., a woman believed to be HILDA GARCIA called PAPO. The following is an excerpt of their conversation, which was partly in Spanish:

PAPO: You could hold that there.

HILDA GARCIA: Yeah.

PAPO: That

HILDA GARCIA: Uh-huh.

PAPO: The ... the money. If you need it, you hold it.

HILDA GARCIA: Yeah ... I got to pay you a lot of shit, man ... A lot of *stuff* I got.

PAPO: All right. So you hold that one. And I ... uh, hold it for m- ... I ... that thing I got from you. I take it out from there.

(Emphasis added). The defendant contends (1) that her voice was not on this tape, and (2) that the speaker said "debts," not "stuff."

Upon listening repeatedly to the tape containing the August 9 call and comparing it with two other calls with Hilda Garcia's voice, this Court finds that the August 9 caller was Hilda Garcia. (12/3 Tr., p. 60). The government has conceded, however, that the call was incorrectly transcribed. The government's final transcript of the August 9 call indicates that the word "stuff" should read "debts."

Because the mistake was so apparent upon listening to the August 9 tape; the word "stuff" has considerable significance in a narcotics context; and the August 9 conversation was featured prominently in Rider A,[6] a *Franks* hearing was held to determine whether the affidavit was deliberately or recklessly false. The Assistant United States Attorney who originally transcribed the August 9 call and Special Agent Emilio Garcia, who executed Rider A, testified at the hearing.

The Assistant United States Attorney (AUSA) testified that some time between August 13 and August 23, 1984, he listened to two cassette tapes of recordings of telephone calls intercepted over the wiretap on Louis Rupert Garcia's phone. He reviewed the logs that were maintained by the agents who were assigned to monitor the wiretapping equipment. (12/18 Tr., p. 7). During the course of that review, the AUSA listened to the August 9 call to Louis Rupert Garcia from Hilda Garcia. The AUSA testified that he transcribed those portions of the conversation which he could understand in order to supplement the brief summary of the call written by the agent. (*See* Government's Exhibit 1, 12/18 Tr., p. 10). He further testified that on the long form he wrote: "A lot of *stuff* I got." (Emphasis added). After having seen the government's final transcript and having heard the tape again, the AUSA now believes that his transcription was incorrect, and should have read: "A lot of *debts* I got." (Emphasis added).

The AUSA testified that while he listened to the August 9 call from 10 to 50 times in order to transcribe it, the call was in both English and Spanish. (12/18 Tr., pp. 9, 21). The AUSA speaks some Spanish but is "by no means fluent." (12/18 Tr., p. 9). Furthermore, the AUSA's primary purpose in reviewing the log's record of the call was to "assure [him]self that .. the monitoring agents were doing things properly." (12/18 Tr., p. 23). In addition to "minimization," The AUSA transcribed the call for inclusion in the seven-day report necessary for the wiretap authorization. (12/18 Tr., p. 23). The AUSA testified that his transcript of the call was not meant to be final. He further stated that in accordance with office procedure, an Assistant United States Attorney would normally review a transcript with a translator for trial or other pretrial purposes. (1/18 Tr., pp. 24-25). The AUSA who originally tran-

---

**6.** The August 9 conversation was the only conversation in Rider A which was presented as if it were part of a transcript, rather than in paragraph form. (Rider A, p. 22).

scribed the August 9 call did not personally participate in the preparation of the application for the search warrant for Hilda Garcia's home.

Agent Emilio Garcia then testified that Rider A was drafted by another AUSA on the basis of the seven-day reports and wiretap logs. (12/18 Tr., pp. 30–34). He also testified that at some point during the investigation he listened to the August 9 call, but he did not remember reviewing the tape immediately prior to the preparation of his affidavit. (12/18 Tr., pp. 34–35). In addition, Agent Garcia stated that he "was listening for total content" of the call. He wanted to see "who the players were speaking, whether they were going to receive a delivery, whether something crucial in the investigation was to take place that night, that moment, that hour, whenever the call came in." Agent Garcia testified that he "didn't analyze it for every exact word." (12/18 Tr., pp. 35–36).

■ The government submitted no testimony from the AUSA who prepared the draft of Agent Garcia's affidavit. There is no evidence regarding how that portion of the conversation was selected for inclusion in Rider A. Nor is there any evidence to suggest that any translator of other AUSA reviewed the initial incorrect transcript of the call, with or without a translator. While the preliminary transcription and translation of the August 9 call by an AUSA who was not fluent in Spanish may have been sufficient for purposes of preparing a seven-day wiretap report, it was not sufficient for purposes of applying for a search warrant. Inclusion of a hasty transcript of the call in Rider A without any effort to ascertain its accuracy constituted reckless disregard for the truth.

The question then becomes whether Rider A contained sufficient evidence of probable cause when purged of the false statement to support the issuance of the search warrant. See Franks, 438 U.S. at 171–172, 98 S.Ct. at 2685; see also United States v. Kahan, 572 F.2d 923, 932 (2d Cir.) cert. denied, 439 U.S. 833, 99 S.Ct. 112, 58 L.Ed.2d 128 (1978) (misstatement must be

both intentional and material); United States v. Kuntz, 504 F.Supp. 706, 711 (S.D. N.Y.1980) (affidavit must be voided (1) if it contains statements which were made with reckless disregard for the truth; and (2) if purged of the false statements, the affidavit fails to support a finding of probable cause).

When the word "debts" is substituted for the word "stuff" in the excerpt of the August 9 call which was included in Rider A, that portion of the conversation is less clearly narcotics-related. The excerpt suggests that Hilda Garcia owes Louis Rupert Garcia a significant sum of money. The reference to "that thing I got from you" remains ambiguous, but could reasonably have been understood to relate to drugs. Certainly, the call in its entirety is suggestive of a relationship between Hilda Garcia and Louis Rupert Garcia which involves narcotics. After Hilda Garcia tells Louis Rupert Garcia that she sent her son, Victor, over to his house, but without money, she says "I need something." Louis Rupert Garcia tells her that Victor isn't there but it's alright for her to hold onto the money.

■ Viewing the warrant application as a whole, the corrected version of the August 9 conversation, in conjunction with Agent Garcia's summary of the fourteen other telephone calls in which Hilda Garcia was involved, provided probable cause for the search of the defendant's residence.

### 3. Other Evidence

Paragraph 4 of Rider A states:

Based on the evidence discussed below, there is probable cause to believe that the named defendants are part of a wideranging narcotics trafficking ring which deals primarily in heroin and cocaine ... (c) ... HILDA GARCIA ... receive[s] narcotics from PAPO.

The defendant argues that probable cause cannot be supported by a conclusory statement like the one made in paragraph 4(c) above. She further argues that if the government had access to information that

was more accurate, it should have produced it when it sought the search warrant for her home. (12/16 Tr., p. 23).

There is no question that paragraph 4(c) would be insufficient to support probable cause if Agent Emilio Garcia's conclusory statement was based on information provided by an informant. Paragraph 4(c) contains neither an explicit indication that the source of the information was reliable or specific facts from which Judge Cannella could have drawn such a conclusion.

█ In this case, however, it was clear to Judge Cannella that Agent Emilio Garcia's conclusion was based primarily, if not entirely, on wiretap evidence or possibly on the results of surveillance by federal agents. Because Judge Cannella had also authorized the wiretaps in this case, he was the recipient of the seven-day reports which contained summaries of the allegedly incriminating conversations intercepted by the government. Familiar with the source of the evidence in this case, he could reasonably rely upon Agent Garcia's summary to establish probable cause. *See United States v. Reed*, 700 F.2d 638, 640–642 (11th Cir.1983) (probable cause was supported by affidavit which did not contain specific facts or indication that source of information was reliable where it was clear that the information contained in the affidavit resulted from personal observation by government officials); *see also United States v. Ventresca*, 380 U.S. 102, 111, 85 S.Ct. 741, 747, 13 L.Ed.2d 684 (1965) (presumption of reliability accorded investigating agents).

█ Hilda Garcia also argues that failure to include the conversations that formed the basis of Agent Emilio Garcia's summary conclusion was reckless. Even if that decision was reckless (which this Court does not find), where the error would not have weakened, but would have strengthened the affidavit, it does not invalidate the warrant. *Kahan*, 572 F.2d at 932. The inclusion of the fourteen additional calls involving Hilda Garcia would certainly have strengthened Rider A. (For summary of those calls see Government's

Supplemental Memorandum of Law In Opposition To The Motion Of Hilda Garcia, hereinafter "Government's Supplemental Memo # 2, pp. 2–5). For example:

On June 17, 1984, at 4:05 p.m., Hilda called Papo and asked if he'd "be there" in about a half-hour because "Victor ... has to go there." Hilda said, "You got nothing." PAPO responded, "Yeah." Hilda said, "I'll send you the money and that's it; I'll send it to you." Shortly thereafter, Papo called Hilda and the following conversation ensued:

HILDA: Hello?

PAPO: Yeah. Listen ...

HILDA: Yeah ...

PAPO: The, the, the new ones cost 500 more.

HILDA: Nine thousand dollars.

PAPO: Yeah.

HILDA: Oh.

PAPO: So, just so you know.

HILDA: O.K.

PAPO: You heard?

HILDA: Yeah.

PAPO: 'Cause it's not mine; it's from some other place.

HILDA: O.K.

PAPO: O.K.?

HILDA: All right.

(Government's Supplemental Memo # 2, p. 4). In addition:

On July 12, 1984 at 1:35 p.m., Hilda called Papo and asked if Chepin was there. Papo said that he left. Hilda replied, "Oh, I wanted him to send me something but now is too late. I'm here at the place." Papo said, "All right. So you come." Hilda responded, "I wanted him to fix one for me, you know ..." Papo then described the key Hilda should use to get in. The conversation ended as follows:

HILDA: Look ...

PAPO: Yeah.

HILDA: ... one.

PAPO: Just come up.

HILDA: O.K.

(Government's Supplemental Memo # 2, pp. 4–5).

These conversations clearly relate to narcotics transactions involving Hilda Garcia and other alleged members of the conspiracy. They would have enhanced the application for the search warrant; they would not have weakened it.[7]

### CONCLUSION

Defendant Hilda Garcia's motion to suppress is denied. Treating the application for the warrant as a whole, there was sufficient probable cause to authorize the search of the defendant's residence.

It Is So Ordered.

---

**7.** Even reading these conversations in light of the fact that (1) Hilda Garcia is Louis Rupert Garcia's sister; and (2) she is on public assistance, they suggest a narcotics relationship. Hilda Garcia admits that the latter conversation (which she says occurred on July 13), involved a drug transaction. Hilda Garcia asserts that in the first conversation "Papo calls Hilda and tells her the new coat cost $500 more." (Defendant's Second Memorandum In Support Of Motion To Suppress, p. 6). The fact that she may now provide an innocent explanation for the first conversation (which she states took place on June 16), does not negate probable cause to issue the search warrant. *United States v. Fama,* 758 F.2d 834, 838 (2d Cir.1985).